**STATE of Missouri, Respondent,**

v.

**Johnnie L. THOMAS, Appellant.**

**No. ED 78744.**

Missouri Court of Appeals,
Eastern District,
Division Five.

Jan. 22, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 13, 2002.

Application for Transfer Denied April 23, 2002.

David C. Hemingway, Asst. Sp. Public Defender, St. Louis, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Evan J. Buchheim, Asst. Attorney General, Jefferson City, MO, for Respondent.

PAUL J. SIMON, Judge.

Johnnie L. Thomas (defendant) appeals the judgment entered on verdicts of guilty by a jury of first degree murder in violation of Section 565.020 RSMo (2001) (all further references herein shall be to RSMo 2001 unless otherwise indicated), armed criminal action in violation of Section 571.015, first degree burglary in violation of Section 569.160, and first degree assault class B felony in violation of Section 565.050, for which he was sentenced to consecutive terms of life imprisonment without possibility of probation or parole, life, fifteen years, and an additional fifteen years. On appeal, defendant contends that the trial court erred and abused its discretion in refusing to dismiss the indictment or remand to juvenile court because the juvenile court abused its discretion in concluding defendant needed more rehabilitation than the juvenile court could provide "since the deputy officer based his opinion ... on the false premise that [defendant] could only remain under the juvenile court's authority until age 18," when in fact, the juvenile court had the authority to retain jurisdiction until defendant reached the age of 21. Defendant further argues in his first point that due process dictates a remand for a new certification hearing due to the loss of the transcript from the

original certification hearing because, as a result of such loss, defendant cannot fully state his challenge to his certification and further that efforts to stipulate to the record have failed. In his second point, defendant contends that the trial court erred and abused its discretion in overruling defendant's objection after the state "sought commitments" from the jury during voir dire by asking the venire persons to speculate as to whether they could convict defendant based upon the testimony of one witness. In his third point, defendant argues that the trial court erred and abused its discretion in denying defendant's motion to strike venire person Carol Koval (Koval) for cause in that she never unequivocally stated that her concerns for her father, who had liver cancer and lived in the eastern United States, and her son, who had recently been arrested in nearby St. Charles, would not preclude her from listening to the evidence. Defendant further argues in his third point that Koval did not unequivocally state that the fact that a friend of hers had been murdered in a case similar to this case would have "no effect on her." In his final point on appeal, defendant claims that the trial court erred in denying his motion for judgment of acquittal as to the burglary count because the evidence did not establish that defendant entered victim's house unlawfully, but rather showed that he knocked at the door and was admitted with victim's permission. We affirm.

■ On appeal, we examine the evidence and its reasonable inferences in the light most favorable to the verdict and disregard all contrary evidence unless it is supportive of the verdict. *State v. Grim*, 854 S.W.2d 403, 405 (Mo.banc 1993). Applying this standard, the evidence reveals the following: At the time of the incident, Pamma Thomas (victim) lived with her husband, Anthony Thomas (Anthony), and her two children ages eleven and nine in a house at 1237 Gimblin in the City of St. Louis. Anthony's sister, Sharon Thomas, is the mother of then sixteen-year-old defendant, and another sister, Darlene Thomas (Darlene), is the mother of then thirteen-year-old Darnell Thomas (Darnell). Defendant and Darnell lived with their grandparents, Johnnie Thomas, Sr. and Bessie Thomas, in a house at 1245 Gimblin, two houses down the street from victim's house.

On Tuesday, April 27, 1999, Anthony Thomas awoke and prepared to go to work. His brother stopped by and the two were talking when defendant knocked at the front door and asked for a cigarette. Anthony and his brother informed defendant that they had none and defendant left.

Anthony and his brother continued their conversation as they walked to Anthony's car. Defendant appeared once more, informing Anthony and his brother that he needed someone to work on his car. They talked for about ten minutes at which time defendant accused Anthony of selling a car that was a "lemon" to Johnnie Thomas, Sr. Victim defended her husband, telling defendant that Anthony had sold the car because it was old and had been in the family "for a long time."

Following the quarrel with defendant, Anthony went to work. Later that morning, victim phoned him to discuss the evening meal. At about 12:30 p.m., Anthony went home for lunch.

Upon reaching the house, Anthony pulled his car into the driveway and remained there for about 30 seconds listening to the end of a favorite song. He then got out of his car and walked to the backyard to check on the couple's newly built garage. Before he reached the garage, he noticed that a back door to the house was ajar. Concerned, Anthony went to the

door and looked inside. His eyes were directed to his wife laying motionless at the bottom of the basement steps near the washroom. She had on "a little pink gown of hers" and her "top was off." Figuring that she had gotten tired washing clothes, Anthony called out: "Hi, Pam, baby, are you tired? Are you sleepy or something? *Why don't you go upstairs and lay down?*" Victim did not respond, and Anthony walked down the stairs.

Once he reached her, Anthony noticed a white plastic bag over victim's face tied tightly around her neck. After pulling the bag off her head and seeing a belt also tied around her neck, Anthony began to "scream and yell."

Anthony ran up the stairs to "make a phone call" from the phone located in the dining room. To reach the dining room, Anthony had to run through the kitchen and then through a hallway. On his way to the dining room, he saw that the house had been ransacked. After passing a bathroom located off of the hallway, Anthony noticed a figure sitting on a love seat in the dining room making hand gestures toward him. The room was not well lit and it was not until his eyes adjusted to the darkness that he recognized the figure as his nephew, Darnell. Anthony began screaming at Darnell and asked him what had happened. Darnell sat silently and continued making hand gestures toward Anthony.

Anthony then heard a clicking sound behind him. He turned around to see defendant pointing a shotgun directly toward his face. Anthony had stored this shotgun under his bed loaded with one shell and he noticed several shotgun shells laying on the floor. Defendant told him: "Don't move, don't move motherf* * *er, I will kill you like I killed her." Anthony became "delirious" and started to scream. Defendant pulled the trigger.

Amazingly, the shotgun merely produced a clicking sound. Anthony grabbed the barrel of the gun while defendant cocked the gun and pulled the trigger but it did not discharge. The two fought for control of the shotgun while defendant yelled to Darnell: "Kill him, kill him, you got to kill him too, he got to die too!" Darnell grabbed a knife and approached Anthony, who managed to fend Darnell off while still fighting with defendant. Darnell ran through the kitchen and out the back door screaming: "I'm going to kill you motherf* * *er, if you hurt my nephew or cousin I'm going to kill your ass" and "You better not kill my uncle, (sic) I'm going to kill your ass, I'm going to kill your ass." Darnell ran to his grandparents house and told his grandparents and mother that Anthony and defendant were fighting.

Anthony and defendant continued to wrestle over the gun. During the struggle, Anthony attempted to grab the phone to call the police. However, defendant pulled the phone out of the wall and the struggle for the gun continued.

Darnell returned to the scene with his mother Darlene and his grandparents. The struggle continued until, finally, with Darlene's encouragement, defendant let go of the shotgun. Defendant and Darnell then ran out of the house. Victim was pronounced dead at the scene.

Defendant was arrested and a Petition, which is not part of this record, was filed in juvenile court alleging first degree murder, first degree burglary, first degree assault, and armed criminal action. The Chief Juvenile Officer filed a Motion to Dismiss the Petition to Allow Prosecution of Defendant Under the General Law of Missouri, in which she alleged that defendant was not a proper subject to be dealt

with under the provisions of the Juvenile Code for the following reasons:

(a) The offenses alleged are serious and protection of the community requires that the matter be transferred to a court of general jurisdiction;

(b) The offenses alleged involved viciousness, force and violence;

(c) The offenses alleged were against persons, property and the State of Missouri;

(d) The [j]uvenile has no previous referrals to the Juvenile Court;

(e) The juvenile is sophisticated in his pattern of living and associations;

(f) The age of the juvenile does not preclude certification;

(g) A need for long term treatment in a structured setting and environment, with more controls and for a longer period of time than are available under the Juvenile Code is indicated in order to effect the rehabilitation of the juvenile; [and]

(h) Racial disparity in certification is not a factor in this matter.

The Chief Juvenile Officer also filed a report recommending certification of defendant as an adult. Under the heading, "Alternative Plan," the report provided:

Placement at Division of Youth Services was considered but deemed inappropriate due to:

Youth's age, sophistication of the offense, and the fact the Division of Youth Services would not provide services after a youth turns 18 years of age. Further, it is the common practice of the Division of Youth Services not to retain jurisdiction after a youth's 18th birthday.

The report further provided that defendant "appears to be of low average intelligence, responsive, very concerned, taciturn, angry, mature, and overall a pleasant young man," that defendant "appears to know the difference between right and wrong," "appears to be sophisticated in his manner of living in that he makes his own decision" and that "This officer feels [defendant] is 'mature' as this officer has observed [defendant] ignore the taunts of other detainees and [defendant] thinks before he answers a question."

Finally, the report provided that the charges against defendant "in and of themselves exhibit a high degree of sophistication" indicating that defendant was beyond the "helping efforts" of the Juvenile Court, and that certification was warranted for the following reasons:

For the protection of the community, [defendant] needs more than this Court and Division of Youth Services can offer, Division of Youth Services will retain jurisdiction until 18 years of age only. It is necessary that [defendant] be confined for more than 14 months.

The report next listed verbatim the factors and conclusions in the Motion to Dismiss, with the exception of the statement, "The Juvenile has no previous referrals to the Juvenile Court," which was replaced with "The Juvenile has one previous referral to the Juvenile Court" in reference to a referral for truancy in 1996.

On July 21, 1999, the court entered its judgment dismissing the juvenile petition, permitting defendant to be prosecuted under the general law, and providing that defendant was not a proper subject to be dealt with under the provisions of the Juvenile Code for the following reasons:

(1) The offenses alleged are serious and protection of the community requires transfer of this matter to a court of general jurisdiction;

(2) The offenses alleged involved viciousness, force and violence;

(3) The offenses alleged were against persons, property and the State of Missouri;

(4) The [j]uvenile has one previous referral [to juvenile court for truancy for which no action was taken];

(5) The [j]uvenile is sophisticated in his pattern of living and associations;

(6) The age of the juvenile has been considered as a factor and is outweighed by the other factors present in this matter;

(7) A need for long term treatment in a structured setting and environment, with more controls and for a longer period of time than are available under the Juvenile Code, is indicated in order to effect the rehabilitation of the juvenile;

(8) The juvenile is beyond the rehabilitative care, treatment and services available to this Court, and cannot benefit therefrom; [and]

(9) There was no evidence of racial disparity in this matter.

Subsequently, a grand jury indicted defendant on all four counts alleged in the petition and, later, the state filed a Substitute Information in Lieu of Indictment that any charge of second degree murder submitted by the state would be based upon the death of victim as a result of the perpetration of burglary by defendant. A Special Public Defender was appointed counsel for defendant.

Defendant filed a Motion to Dismiss the Indictment or, in the Alternative, for Remand to the Family Court Division, alleging that meaningful review of the findings of the Juvenile Court could not be achieved due to a lack of specificity of those findings. Defendant argued that he was not "beyond rehabilitative care, treatment and services available to the Court" and that the juvenile court gave little consideration to the fact that, with the exception of truancy, defendant had no prior history with the Court. Said motion was denied.

At trial, Darnell testified as follows: On the date of the incident, he was at home because he had been suspended for skipping his seventh grade class. Defendant was not in school either and had not been for "a long time." That morning, the two sat on their grandma's front porch conversing about defendant's need for money "for his baby" and how they could obtain the money by breaking into victim's house. The two then devised a rough plan under which Darnell was to keep watch while defendant broke into the house and stole "the money." The two walked to their Uncle's house to proceed with their scheme.

Prior to attempting to break into the house, defendant decided to knock on the front door. To defendant and Darnell's surprise, victim answered the door. Defendant asked, "Can I use your phone?" Victim turned around to get the telephone. At that time, defendant hit victim on the side of the face, knocking her to the living room floor. Victim asked "What did you hit me for?" and got up from the floor. Defendant grabbed her by the neck and began to choke her from behind.

The two struggled in the living room for about 15 minutes, during which time victim repeatedly asked, "What are you doing [this] for?" and defendant continued to choke her. The struggle eventually led to the bedroom, where the two fell to the floor. At that time, defendant ordered Darnell, "Get me a belt!" Darnell asked, "For what?" Once again, defendant ordered, "Get me a belt!" and Darnell grabbed a belt and gave it to defendant.

Defendant choked victim with the belt while Darnell stood and watched. The choking lasted for about a minute, after

which a "long, straight, whistling noise" came from victim's "nose or mouth."

With Darnell holding onto her legs and defendant her arms, the two dragged victim into the kitchen, where defendant stopped, stating: "I can't look at her. She making my stomach hurt. Put a bag over her head." Defendant grabbed a plastic bag and put it "on her mouth." With the belt still around her neck, the two dragged victim to the bottom of the basement stairs where they left her.

Defendant and Darnell went back upstairs where Darnell kept lookout while defendant ransacked the house looking for and taking valuables. In addition to other items, defendant found Anthony's shotgun attached with wire to his bed. Defendant clipped the wire with wire-cutters and took the shotgun.

About ten minutes later, Darnell noticed his Uncle's car pull into the driveway. Darnell told defendant, who grabbed the shotgun. The two watched Anthony as he walked to the backyard. At that point, the two were trapped inside the house because they could not find the key to unlock the front door. Darnell sat down on the love seat in the dining room. Defendant went into the bathroom.

After fleeing the house following defendant's struggle with Anthony, defendant and Darnell devised a story for the police. Defendant told Darnell that if the police asked what happened, they were to state that they "heard a green car speed off" from outside their Uncle's house and that they went to their Uncle's house to see what had happened, found victim dead, went to call the police, and, mistaking Anthony for a burglar, tried to shoot him. Darnell told this story to police, but later withdrew it after a discussion with his mother.

At the close of the State's evidence, defendant filed a Motion for Judgment of Acquittal which was denied. The jury reached its verdicts finding defendant guilty on all counts. Defendant filed a Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial, in which he alleged, among other things, that the trial court erred in denying his motion to strike Koval for cause due to her "inability to listen and consider the evidence in the case based upon experiences involving her family;" and in overruling defendant's objection to the State's use of a hypothetical question which "improperly called for a commitment from the jurors concerning the [s]tate's evidence in the case."

In his first point on appeal, defendant contends that the trial court erred and abused its discretion in refusing to dismiss the indictment or remand his case to juvenile court because the juvenile court abused its discretion in concluding that he needed more rehabilitation than the juvenile court could provide because the deputy juvenile officer based his opinion on the false premise that defendant could only remain under the juvenile court's authority until age 18 when, in fact, the court had authority to retain jurisdiction until defendant reached the age of 21. Defendant also argues that due process dictates a remand for a new certification hearing due to the loss of the court reporter's notes because defendant cannot fully state his challenge to his certification without a transcript, and efforts to stipulate to the record have failed.

■ We first address defendant's argument regarding the loss of the transcript from the certification hearing. While defendant correctly asserts in his brief that an appealing party is entitled to a full and complete transcript for our review, he fails to mention that an incomplete record does not automatically war-

rant reversal of a conviction. *State v. Middleton,* 995 S.W.2d 443, 466 (Mo.banc 1999). To obtain relief, defendant must show both an exercise of due diligence to correct the deficiency in the record and prejudice resulting from the incompleteness of the record. *Id.*

Pursuant to Section 211.071, the juvenile court may dismiss juvenile proceedings and allow prosecution of a juvenile under the general law of Missouri where it is alleged that the juvenile has committed first degree murder under Section 565.020 or first degree assault under Section 565.050. Section 211.071.6 provides that a written report detailing information relevant to the criteria utilized by the court in making its determination as to whether the child is appropriate to be dealt with under the Juvenile Code and whether there is a reasonable prospect of the juvenile's rehabilitation within the juvenile system shall be prepared and that the criteria the court uses in making its determination "shall include but not be limited to:" (1) the seriousness of the offense charged and whether protection of the community requires transfer to a court of general jurisdiction; (2) whether the offense involves viciousness, force and violence; (3) whether the offense was against persons and personal injury resulted; (4) whether the offense is part of a repetitive pattern of offenses; (5) the record and history of the child; (6) the sophistication and maturity of the child; (7) the age of the child; (8) the program and facilities available to the juvenile court; (9) whether the child can benefit from programs available to the juvenile court; and (10) any racial disparity in certification.

■ The criteria listed in Section 211.071.6 are *non-exclusive* and our review is limited to a determination of "whether, in the totality of the circumstances, [the] juvenile court abused its discretion in [its]

certification order." *State v. Whitfield,* 947 S.W.2d 537, 539 (Mo.App. E.D.1997). The juvenile court was not required to give equal weight to each of the listed factors, nor was it required to make an express finding on each one. *State v. Perry,* 954 S.W.2d 554, 567 (Mo.App. S.D.1997). We will not weigh the evidence nor determine the reliability or credibility of the witnesses. *Id.*

■ Here, the juvenile court based its decision upon nine of the ten criteria listed in Section 211.071.6 and specifically found, inter alia, that the offenses alleged: (1) were serious to the extent that protection of the community required defendant to be tried under the general law; (2) involved viciousness, force and violence; and (3) were against persons as well as property. The juvenile court also found that defendant was "sophisticated in his pattern of living and associations" and that the age of defendant was considered but deemed "outweighed by the other factors." Notably, the serious nature of the crime is the dominant criterion among the ten factors. See *State v. Seidel,* 764 S.W.2d 517, 519 (Mo.App. S.D.1989).

Further, the juvenile officer's report stated that placement at the Division of Youth Services was considered but deemed inappropriate due to defendant's age, the sophistication of the alleged offenses, and the fact that "*it is the common practice of the Division of Youth Services not to retain jurisdiction after a youth's 18th birthday.*" [Emphasis added.] Section 211.041 provides, in pertinent part, that when jurisdiction has been acquired by the juvenile court, jurisdiction of a child may be continued until the child attains the age of 21, "except in cases where he is committed to and received by the division of youth services." Section 219.021.1 provides, in pertinent part: "The [D]ivision [of Youth Services] shall not keep any child beyond

his eighteenth birth date, except upon petition and a showing of just cause in which case the division may maintain custody until the child's twenty-first birth date." Thus, absent a petition and showing of just cause, the Division of Youth Services is not authorized to keep a child beyond the age of 18. The juvenile officer's statement that "it is common practice of the Division of Youth Services not to retain jurisdiction after a youth's 18th birthday" was correct with respect to Section 219.021.1 and, further, it was reasonable for the juvenile officer as well as the juvenile court "to conclude that from a practical standpoint" rehabilitation within the juvenile system was only available to defendant until he reached the age of 18, and that based upon the crime alleged such period "was not adequate to rehabilitate defendant and more important, to protect society from him." *State v. Tate*, 637 S.W.2d 67, 72 (Mo.App. E.D.1982) [overruled on other grounds, *State v. Carson*, 941 S.W.2d 518, 520 (Mo.banc 1997) ].

For the foregoing reasons, we find that defendant was not prejudiced by the loss of the transcript from the certification hearing and, further, in the totality of the circumstances, that the trial court did not abuse its discretion in denying defendant's motion to dismiss the indictment or remand the case to juvenile court. Since the record clearly indicates defendant was not prejudiced by the loss of the certification transcript, it is not necessary to address the due diligence aspect. Point denied.

In his second point, defendant contends that the trial court erred and abused its discretion in denying his objection that the prosecutor sought commitments from the jury during voir dire by asking venire members to speculate as to whether they could convict defendant on the testimony of one eyewitness in that such inquiry asked the venirepersons to speculate how they would act in a hypothetical situation contrary to the rule prohibiting such questions. Defendant further argues that the fact that the state asked "could" they convict rather than "would" they convict is a distinction without a difference, since either wording called on the jury to speculate about convicting defendant and served to precondition them through a pledge to convict if they found a single witness's testimony truthful.

During voir dire examination, the following transpired:

State: [If following the testimony of one witness,] you believe all the elements of the offense beyond a reasonable doubt, can you convict based upon that person is the question. Can everybody in the back row?

Defense

Counsel: Your Honor, I'm going to object at this point that the hypothetical asks for an improper commitment from the jurors.

Court: Well, she's (sic) asking could they not, would they, so I'm going to overrule the objection.

 Control of voir dire "is vested in the discretion of the trial court," which is in the best position to determine the effect of exchanges with the venire persons during the examination. *State v. McCain*, 845 S.W.2d 99, 101 (Mo.App. E.D.1993). Defendant's argument is similar to that raised in *McCain*, following the state's inquiring whether the venire persons "would be able to make a decision on guilt or innocence based on testimonial evidence alone in the event that no physical evidence was presented." *Id.* McCain argued that such inquiry was an impermissible attempt to commit the jury to a future course of action by inquiring whether the jurors anticipated more than just witness testimony. This Court denied McCain's point, reasoning that: "It is necessary for

the prosecutor to establish exactly what the potential jurors associate with the prosecutor's burden of proof." *Id.* Here, the state has similarly inquired as to whether the venire persons could make a decision on guilt or innocence based on the testimony of one witness in the event that no other witnesses were presented. The state's question, "If it's just the one witness you may require something more than just beyond a reasonable doubt?" serves to clarify the fact that the state was attempting to establish exactly what the potential jurors associated with its burden of proof. Defendant's second point is not meritorious.

In his third point on appeal, defendant argues that the trial court abused its discretion in denying appellant's motion to strike Koval for cause in that Koval never unequivocally stated that "her concern for her father's liver cancer in the Eastern United States and her son's recent arrest in St. Charles would not preclude her from listening to the evidence, and in that [Koval's] best friend was murdered in front of her home yet no one was arrested though a family member was suspected and she did not unequivocally state that the similarity between her friend's murder and the one on trial would have no effect on her."

During voir dire, the prosecuting attorney asked the venire persons if any of them had known any murder victims, after which the following colloquy was had:

Koval: Best friend was murdered.

State: And how long ago was this?

Koval: In the '80's.

State: Was it in the City of St. Louis?

Koval: No, City of Chicago, out in front of her house.

State: Are you aware of the facts of that particular case?

Koval: Well, they suspected a family member.

State: And was anybody ever arrested or charged with it?

Koval: Uh-uh, not enough evidence.

State: Is there anything about that experience you think that's going to prevent you from being fair and impartial in this particular case?

Koval: I don't think so.

State: Have you formed any opinions as to whether or not the police did their job or-

Koval: I don't think they did.

State: Okay. Do you think that that's going to affect your ability, obviously it's Chicago police, do you think that's going to influence you in any way if you were to listen to a police detective in this case?

Koval: No, if they did their job and the evidence was there.

Further into the examination, the prosecutor asked the venire persons if they or their family members or friends had been arrested, charged, or convicted of any crimes, or placed on probation. At that time, Koval asked, "May I talk to the judge?" and the following proceedings were then had at the bench:

Koval: My son is in jail right now, he's in St. Charles, $10,000 bond.

Court: He's awaiting trial?

Koval: Um-hmm.

\* \* \*

Koval: I haven't been able to talk to him because I haven't been in town. I came back in town last night and this happened while I was gone, but his sisters have, but they really can't give me much information and I'm confused about it too. I was hoping to find something out today but I'm here.

State: Okay. Do you think that that in any way is going to affect your abili-

ty—you understand those are two different instances what's happened with your son and what this particular individual is charged with, can you separate those two instances?

Koval: It's that, and I have my father with his cancer.

\* \* \*

State: But nothing about that you think is going to affect your ability to be fair and impartial?

Koval: No, except that it's on my mind what's happening with him and my dad, that's about all.

\* \* \*

Defense Father that's ill and your son currently having these problems, do you

Counsel: think it would have an affect on you listening to the evidence in this case and you could put it aside?

Koval: I can try, I can try. I can't sleep at night because of it, but as far as the trial, I probably could try. I'm not positive but I can try, that's all I can say.

Defendant: So there's a possibility these other things could distract you?

Koval: Um-hmm.

Defendant: I wasn't sure I heard you before. Did you say due to your father's condition there's a possibility you would get a call to leave at a moment's notice?

Koval: Yeah.

\* \* \*

State: One other question. Obviously these are distractions to you, but have you had a problem following what's been going on in court here today? Have you had any problems following the questions or anything like that?

Koval: No.

State: So when you say it's a distraction?

Koval: It's in the back of my mind, it's a concern.

State: You've not been tuning me out other than the fact I'm probably boring?

Koval: No.

Defendant moved to have Koval struck for cause because she stated that "her personal situation with her son, could affect her listening to the evidence in this case." The state responded: "I think she said it was distracting, but when I asked her how she's interpreted that, she said she's been following everything in court, so I don't think it's given to a level." The trial court overruled the objection, stating: "I consider her answers in their entirety. I'm not going to strike her, it's possible to lose her during some course of the trial. So we have one qualified juror on page 1."

▇▇▇▇ "A defendant is entitled to a full panel of qualified jurors before being required to make peremptory challenges." *State v. Plummer*, 860 S.W.2d 340 (Mo. App. E.D.1993). In order to qualify as a juror, a venire person must be able to perform with an open mind, free from bias or prejudice. *Id.* A venire person's "beliefs" must impair his or her ability to follow the instructions in order for that person to be struck for cause. *Id.*

▇▇▇▇ The trial court has "wide discretion" in determining potential jurors' qualifications after considering voir dire in its entirety. *Id.* Such determination is one of fact made based upon an observation of the venire person and hearing the answers given. *Id.* We therefore will not disturb the trial court's ruling on a challenge for cause "absent a clear abuse of discretion and a real possibility of injury to the com-

plaining party." *Id.* at 348, 349. Doubts as to the trial court's ruling are to be resolved in the trial court's favor. *Id.* at 349.

■■■■■ Where a venire person appears uncertain about his or her ability to be fair and impartial, the trial court has a duty to make an independent inquiry. *Id.* "When an answer to a question suggests the possibility of bias and, upon further questioning, the venire person gives unequivocal assurances of impartiality, the bare possibility of bias will not disqualify the venire person or deprive the trial court of discretion to seat the venire person." *Id.*

■■ We initially note that trial counsel's motion to strike for cause was based upon Koval's "personal situation with her son," and makes no reference to Koval's concern for her father nor to the murder of her best friend. Regardless, we find no error, plain or otherwise, in the trial court's denial of defendant's motion to strike Koval for cause. With regard to her "personal situation with her son," Koval stated that it would not affect her ability to be fair and impartial, though it would be "on [her] mind." She further stated with regard to the situation with her son, her best friend's murder, and the situation with her father, that she had "no problem" following the occurrences in court. The trial court did not clearly abuse its discretion in overruling defendant's motion to strike Koval for cause. Point denied.

In his fourth and final point on appeal, defendant argues that the trial judge erred in denying his motion for judgment of acquittal as to the burglary count because the evidence did not establish that defendant entered victim's house unlawfully, but rather that he knocked at the door and was admitted with victim's permission.

The state charged defendant with first degree burglary under Section 569.160, which provides, in pertinent part:

1. A person commits the crime of burglary in the first degree if he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein, and when in effecting entry or while in the building or inhabitable structure or in immediate flight therefrom, he or another participant in the crime:

(1) Is armed with explosives or a deadly weapon or;

(2) Causes or threatens immediate physical injury to any person who is not a participant in the crime; or

(3) There is present in the structure another person who is not a participant in the crime.

The terms "enter unlawfully" and "remain unlawfully" are defined in Section 569.010(8), which provides: "A person 'enters unlawfully or remains unlawfully' in or upon premises when he is not licensed or privileged to do so."

Defendant was charged with unlawfully entering the house rather than unlawfully remaining in the house, and he argues that there was insufficient evidence to support the conviction because he had permission to enter victim's house.

In *State v. Rollins,* 882 S.W.2d 314, 315 (Mo.App. E.D.1994), Rollins told victim that he needed to enter the apartment where she was babysitting in order to look for his wallet. *Id.* at 315. Once he gained entry, he assaulted victim and attempted to rape her. *Id.* Rollins, who was charged with unlawfully remaining rather than unlawfully entering pursuant to Section 569.160, argued that there was insufficient evidence to support his burglary conviction because there was no evidence that victim unequivocally withdrew any license to remain, and that therefore he could not have

knowingly unlawfully remained in the apartment. *Id.* at 317. We upheld the burglary conviction, concluding: "[Rollins'] position ignores the fact that he never had a valid license to be in the apartment, because he obtained victim's consent through artifice." *Id.* at 317.

Also, in *People v. Hutchinson,* 124 Misc.2d 487, 477 N.Y.S.2d 965, 966 (N.Y.Sup.Ct.1984), which we find informative, Hutchinson obtained permission to enter victim's dormitory room by requesting to use her bathroom, and subsequently accosted and stabbed her. He appealed his conviction for burglary arguing that there was insufficient evidence that he had "entered or remained unlawfully" in victim's dormitory room. *Id.* at 965. Construing the phrase "enters unlawfully," the Court held that because he had obtained entry through "trick or artifice," he entered unlawfully. *Id.* at 966. The Court further stated: "The intruder who breaches the barrier with a lie or deception, by pretending to deliver a package or to read a meter, is no less dangerous than his more stealthy cohorts, and nothing in the statute suggests an intent to exempt him from liability." *Id.* at 967.

Likewise here, defendant never had a valid license to be in victim's house because he gained access through artifice, i.e., by telling victim that he needed to use her phone when that clearly was not his intention. We therefore find that there was sufficient evidence from which a reasonable juror might have found the defendant guilty of burglary beyond a reasonable doubt. Point denied.

Judgment affirmed.

JAMES R. DOWD, C.J. and SHERRI B. SULLIVAN, J., concur.