

# Missouri Court of Appeals
## Southern District

In Division

IN THE INTEREST OF M.T., )
PEMISCOT COUNTY CHIEF JUVENILE )
OFFICER DIEDRA ASHLEY )
)
    Respondent, ) No. SD37119
)
v. ) **Filed: November 2, 2022**
)
M.T., )
)
    Appellant. )

APPEAL FROM THE CIRCUIT COURT OF PEMISCOT COUNTY

Honorable Joshua D. Underwood, Judge

**<u>AFFIRMED</u>**

Appellant, M.T., appeals the judgment of the juvenile division of the circuit court ("the juvenile court") dismissing the juvenile cause of action against him and certifying him to be prosecuted as an adult for the crime of murder in the first degree. *See* § 211.071.[1] M.T. raises two points on appeal. In point 1, M.T. argues the juvenile court violated his "rights to a meaningful certification proceeding and due process of law—guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, Article I, Section 10 of the Missouri Constitution, and Section 211.071" because the juvenile officer did not conduct a full investigation as to whether he was a proper subject to be dealt with under the juvenile code.

---

[1] All statutory citations are to RSMo Cum. Supp. (2020). All rule references are to Missouri Court Rules (2022).

Because M.T. did not present this constitutional objection to the juvenile court, it is not preserved for our review. In point 2, M.T. argues the juvenile court abused its discretion in dismissing the juvenile cause of action and certifying him to be tried as an adult because it did not consider the totality of the circumstances.[2] Finding no such abuse of discretion, we affirm the juvenile court's judgment.

## Factual and Procedural Background

On February 19, 2020, when M.T. was 15 years old, Respondent Chief Juvenile Officer Diedra Ashley ("Ashley") filed an amended petition alleging M.T. committed the delinquency offenses of assault in the fourth degree, peace disturbance, possession of less than ten grams of marijuana, being habitually absent from the home, and stealing $250. The juvenile court found the allegations in the juvenile case to be true and placed M.T. on probation with a condition that M.T. be treated in an adolescent drug-treatment program.

On December 15, 2020, Ashley filed a motion to modify M.T.'s disposition, alleging M.T. had committed acts that, had he been an adult, would be considered first-degree murder and armed criminal action. Ashley filed a motion to dismiss the juvenile proceeding and certify M.T. to be prosecuted as an adult under the general law. A Rule 129.03 certification report was prepared by Deputy Juvenile Officer Amanda Tate ("Tate") under Ashley's supervision.

The certification report alleged in pertinent part:

1. That on or about December 14, 2020, [M.T.] allegedly committed the offense of First-Degree Murder and Armed Criminal Action which are serious offenses and require that a hearing be held to consider transfer to court of general jurisdiction for the protection of the community.

2. That the alleged offenses committed were considered vicious, forceful, and violent.

3. That the alleged offenses committed were against a person.

---

[2] Respondent filed no brief in this appeal. "While there is no penalty for that omission, we must adjudicate [M.T.'s] claim of error without the benefit of whatever argument, if any, Respondent could have made in response to it." *Scates v. State, Dept. of Soc. Servs., Div. of Child Support Enf't*, 978 S.W.2d 793, 793 n.1 (Mo. App. S.D. 1998).

4. That [M.T.] has shown repetitive pattern of behavior indicating that the juvenile is beyond the realm of rehabilitation under the juvenile code.

5. That [M.T.] has repetitive history with the Juvenile justice system including referrals for Peace Disturbance, three referrals for Behavior Injurious to Self/Others, five referrals for Habitually Absent from Home, four referrals for Possession of Marijuana/Synthetic Cannabinoid of 10 Grams or Less, Beyond Parental Control, Assault in the Fourth Degree, Stealing, and Failure to Appear. [M.T.] has been on formal supervision since July 13th, 2020 and has attended two 60-day inpatient rehabilitation programs for drug abuse resulting from these referrals.

6. The sophistication and maturity of [M.T.] is equal to that of an average sixteen-year-old.

7. That [M.T.] is 16 years old with his date of birth being September [ ], 2004.

8. The Missouri Division of Youth Services would be the only available program in regards to disposition.

9. Given the serious nature of the crime, the Missouri Department of Corrections would be better equipped to provide effective rehabilitative services than the Division of Youth Services and would also have more effective policies in place which would allow for continued monitoring, supervision and protection of the community.

10. That racial disparity in this case has not an issue as the allegation is one that the court shall order a hearing be held to determine if [M.T.] should be certified to allow prosecution under the general law.

M.T. filed a Motion to Compel Juvenile Division to File Report Consistent with Section 211.071 ("motion to compel"), arguing the report failed to "develop[] fully all available information relevant to the criteria" required by section 211.071.6. The juvenile court denied the motion to compel.

The juvenile court held a hearing on Ashley's motion to certify M.T. as an adult. At the hearing, the following evidence was adduced.

During an investigation into the death of Eathon Briscoe ("Briscoe"), M.T. admitted to a police officer he shot and killed Briscoe after an argument in which Briscoe threatened to shoot him. Allegedly, M.T. shot Briscoe six times using Briscoe's gun with the final shot fired from close range.

3

Tate, who was also M.T.'s supervising juvenile officer, testified she had received referrals from M.T.'s junior high school alleging M.T. got in trouble for being disrespectful, telling tasteless jokes, and fighting. M.T. also had another referral for not returning home after going to a football game. While on probation, M.T. tested positive for marijuana in most of his drug screenings. M.T.'s home environment was violent, and he had witnessed an individual being shot.

Tate primarily had interactions with M.T.'s mother and "[m]aybe [had] one phone conversation with his father." Tate testified she had "worked with a lot of 16 year olds, and [M.T.] seemed to be progressing just like any other 16-year-old did." "[H]e seemed to have a lot more street smarts . . . than a lot of 16-year-olds." Tate believed M.T. had a normal level of maturity compared to other children in the delinquency system and that M.T. "progressively got worse" during his time in the juvenile system. M.T.'s parents were not supportive. M.T. spent additional time in a detention center because his parents did not attend scheduled hearings. M.T. was placed in two drug rehabilitation programs, neither of which were successfully completed. After leaving treatment, M.T. was never re-enrolled in school because his mother never completed the necessary paperwork. During cross-examination, Tate testified that prior to Briscoe's murder, she believed M.T. should be sent to the Division of Youth Services ("DYS") for rehabilitation and supervision. After Briscoe's murder, however, Tate concluded the juvenile system could not rehabilitate M.T.

M.T. retained Dr. Matthew Fowler ("Dr. Fowler"), a certified forensic examiner and psychologist specializing in mental health evaluations for criminal defendants. Dr. Fowler testified he diagnosed M.T. with both post-traumatic stress disorder and major depressive disorder with psychotic symptoms in partial remission. Dr. Fowler believed all of M.T.'s health issues were treatable and that M.T.'s functioning and maturity were "very likely to be well below that of an average kid his age when his symptoms have been unmanaged." According to Dr. Fowler, M.T.'s behavior improved, and there were dramatic positive changes in his mental

4

health when he was in a structured setting and not exposed to negative peer influences. Dr. Fowler believed DYS was better equipped to deal with M.T.'s symptoms and behavior than an adult prison would be.

The juvenile court dismissed the juvenile cause of action and certified M.T. to be prosecuted as an adult.[3] M.T. appeals from that judgment in two points.

**Analysis**

*Point 1: Constitutional Claims Raised by M.T. Not Preserved*

In point 1, M.T. argues:

> The hearing court abused its discretion in dismissing the juvenile cause of action and certifying [M.T.] to be prosecuted as an adult because the ruling was made without a full investigation as to whether [M.T.] was a proper subject to be dealt with under the juvenile code, **violating [M.T.'s] rights to a meaningful certification proceeding and due process of law—guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, Article I, Section 10 of the Missouri Constitution,** and Section 211.071, RSMo Supp. 2020—in that Section 211.071 requires [Ashley] to conduct a full investigation as to whether [M.T.] was a proper subject to be dealt with under the juvenile code, a full investigation was never conducted, and [Ashley's] failure to conduct this investigation deprived the hearing court of necessary information; the lack of investigation resulted in the hearing court entering its judgment without sufficient information to carefully consider the circumstances, rendering the hearing court's determination arbitrary and unreasonable.

(Emphasis added).

For the first time on appeal, M.T. argues the juvenile court violated his right to a meaningful certification hearing and due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Missouri Constitution by certifying him to be tried as an adult.[4] M.T.'s motion to compel claimed the certification report did not comply with the statute. However, M.T. never claimed the alleged deficiencies in the certification report violated his constitutional rights. Rather, the motion to compel alleged section 211.071.6 required the report to contain more details than Tate provided.

---

[3] The juvenile court's findings are discussed in more detail in our analysis addressing point 2.
[4] M.T., at oral argument, conceded that his constitutional claims were not raised below.

In order to properly preserve a constitutional issue for our review, it must be raised at the earliest opportunity. ***Sharp v. Curators of Univ. of Mo.***, 138 S.W.3d 735, 738 (Mo. App. E.D. 2003). Additionally, it must specifically designate the constitutional provision claimed to have been violated by express reference to the article and section of the constitution or by quoting the provision itself.[5] ***State v. Knifong***, 53 S.W.3d 188, 192 (Mo. App. W.D. 2001). While M.T. claimed the certification report failed to sufficiently comply with section 211.071, he did not connect his statutory objection to any specific constitutional provision. Nor did he present his constitutional objection at the earliest opportunity, depriving the juvenile court of a meaningful opportunity to consider and rule on the issue. Because M.T. never presented his constitutional claims to the juvenile court, point 1 is not now preserved for our review.[6]

*Point 2: No Abuse of Discretion Based on the Totality of the Circumstances*

In point 2, M.T. argues the juvenile court abused its discretion in dismissing the juvenile cause of action and certifying him to be prosecuted as an adult because the juvenile court did not consider the totality of the circumstances in that:

> (1) [M.T.'s] behavior was not a pattern of increasingly severe offenses, (2) [M.T.] had little meaningful history of being treated in a structured setting inside the juvenile system, (3) considering the circumstances of his home environment, [M.T.] was neither sophisticated nor mature, and (4) the hearing court never meaningfully considered treatment options in the juvenile system.

---

[5] The objection must also state the facts showing the violation and preserve the constitutional question throughout for appellate review. ***State v. Knifong***, 53 S.W.3d 188, 192 (Mo. App. W.D. 2001).

[6] While it is true the juvenile certification process must "measure up to the essentials of due process and fair treatment[,]" ***Kent v. United States***, 383 U.S. 541, 562 (1966), the process passes constitutional muster "if a hearing is provided, the juvenile is given the right to counsel and access to his or her records, and it results in a decision that sets forth the basis for the decision to relinquish jurisdiction in a way that is sufficient to permit meaningful appellate review." ***State v. Nathan,*** 404 S.W.3d 253, 260 (Mo. banc 2013), *superseded on other grounds by statute as recognized in* ***Jones v. Missouri Dep't of Corr.***, 588 S.W.3d 203 (Mo. App. W.D. 2019). (The statute referenced by ***Jones*** was section 558.047, which concerns the procedure for review of life sentences. It does not affect the court's analysis in ***Nathan*** analysis of due process in juvenile certification hearings.) Here, M.T. was represented by counsel, had access to his records, received a hearing, and received a sufficiently detailed decision by the juvenile court setting forth the basis for its decision to relinquish jurisdiction that permits meaningful appellate review.

Our review of a juvenile court's decision to terminate jurisdiction over a juvenile offender is limited to a determination of whether in the totality of the circumstances the juvenile court abused its discretion. ***State v. Woodworth***, 941 S.W.2d 679, 697 (Mo. App. W.D. 1997) (citing ***In interest of A.D.R.***, 603 S.W.2d at 575, 580-81 (Mo. banc 1980)). An abuse of discretion exists where the juvenile court's ruling is so unreasonable and arbitrary that it shocks the sense of justice and is clearly against the logic of the surrounding circumstances. ***Interest of T.D.S.***, 643 S.W.3d 510, 516 (Mo. App. E.D. 2021). We defer to the juvenile court on issues of credibility. ***Woodworth***, 941 S.W.2d at 692.

Section 211.071 sets out the process for certification of a juvenile for trial as an adult.

> When a certification hearing is required by section 211.071.1, "[a] written report shall be prepared . . . developing fully all available information relevant to the criteria which shall be considered by the court in determining whether the child is a proper subject to be dealt with under the provisions of [chapter 211] and whether there are reasonable prospects of rehabilitation within the juvenile justice system."

***J.N.W. v. Juvenile Officer***, 643 S.W.3d 618, 631 (Mo. App. W.D. 2022) (quoting § 211.071.6)). "[T]he court must consider the juvenile officer's report which must contain *all available information* relevant to the court's consideration in making a certification determination." ***T.D.S.***, 643 S.W.3d at 519. "The report should therefore be comprehensive and the juvenile court should consider the report in its entirety. The juvenile officer's testimony, in addition to the report itself, is relevant evidence for the juvenile court's consideration." ***Id.***

Section 211.071.6 provides a non-exhaustive list of ten factors to be included in the certification report. ***J.N.W.***, at 631-32. These factors include the characteristics of the juvenile's offense; the juvenile's history, behavior, age, and sophistication; the program and facilities available to the juvenile court; whether the juvenile could benefit from the programs available to the juvenile court; and racial disparity. ***Id.*** In assessing the factors in section 211.071, the juvenile court is entitled to significant discretion in reaching its certification determination. ***T.D.S.***, 643 S.W.3d at 519. It is not required to give equal weight to, nor to

7

make express findings on, each one of the non-exclusive statutory factors. *J.N.W.*, 643 S.W.3d at 632. It "is only required by section 211.071.7(4) to make '[f]indings showing the reasons underlying the court's decision to transfer jurisdiction' in a manner 'that is sufficient to permit meaningful appellate review.'" *Id.* at 632 (quoting *Nathan*, 404 S.W.3d at 260-61). "Further, it [is] the juvenile court's function to weigh all the evidence, both which tend[s] to support relinquishment of jurisdiction and that which tend[s] to support retention of jurisdiction." *State v. Perry*, 954 S.W.2d 554, 567 (Mo. App. S.D. 1997).

In our case, the juvenile court made findings on each factor. As the juvenile court noted, some paragraphs of the certification report were somewhat conclusory, but other records and reports were provided. Tate was extensively examined on both direct and cross-examination. Rather than address each of the ten factors as found by the juvenile court, M.T. focuses on the findings on factor 4 (repetitive pattern of offenses which indicates juvenile may be beyond rehabilitation), factor 5 (record and history of the juvenile), factor 6 (the sophistication and maturity of the juvenile), factor 8 (the program and facilities available to the juvenile court), and factor 9 (whether juvenile can benefit from a rehabilitative program available to the juvenile court). We start by addressing those factors.

*Factors 4-5*

The fourth and fifth factors instruct the juvenile court to consider whether the juvenile's alleged offenses were part of a repetitive pattern which suggested he was beyond rehabilitation under the juvenile code and assess the juvenile's record and history, "including experience with the juvenile justice system" and other institutions. § 211.071.6(4)-(5). The juvenile court found:

> [M.T.'s] referral to [Ashley] prior to this case was in February of 2020 for Assault 4th and Peace Disturbance when he got into a fight at school and a teacher was struck during the altercation. [M.T.] was placed on Informal Probation as a result. [M.T.] has had many discipline referrals at school. Although outlined in greater detail in the various Reports to the [c]ourt filed in this matter, the referrals included several incidents of being disruptive in class, being disrespectful to other students and school staff/teachers, aggressive behaviors towards teachers and students, refusing to follow directions, assaults, and cursing in the class room.

8

[M.T.] tested positive for THC on many occasions as well while on probation and admitted to having a drug problem.

The above is indicative of a Juvenile exhibiting a repetitive pattern of conduct that is beyond rehabilitation under the Juvenile Code.

. . . .

The Certification Report prepared by [Tate] and required by section 211.071.6 was filed prior to the date of the hearing. [Tate] testified credibly regarding the facts relevant to the [c]ourt's consideration of this factor, and the Certification Report as well as the prior Reports to the [c]ourt accurately set forth [M.T.'s] record and history. However as stated above, [M.T.] had many discipline referrals at school. Although outlined in greater detail in the Reports, the referrals included several incidents of being disruptive in class, being disrespectful to other students and school staff/teachers, aggressive behaviors towards teachers and students, refusing to follow directions, assaults, and cursing in the class room.

Considered in conjunction with the other evidence considered by the [c]ourt regarding [M.T.'s] history of aggressive and defiant behavior at school, these behaviors are indicative of an individual with assaultive behaviors that are beyond the juvenile system's ability to manage or modify.

According to M.T., his delinquency issues and disciplinary problems at school were "the combination of [his] mental-health problems and lack of structure at home—problems and treatment unique to children—that exacerbated these problems." M.T. argues that the juvenile court's findings on these factors described "little more than a child getting in trouble at school[,]" and therefore the juvenile court "committed a clear error of judgment in the course of weighing this factor[.]" The problem with M.T.'s argument is that it is a request for us to reweigh the evidence rather than a demonstration of an abuse of discretion. While we know the juvenile court found this factor in favor of certification, we do not know how much weight it gave this factor given that nine other factors were also found to support certification. Nor is it our job to second guess how much weight the juvenile court should give to each factor. M.T.'s argument ignores both Tate's testimony that M.T. "progressively got worse" during his time in the juvenile system and her opinion that the juvenile system could not rehabilitate M.T. We are not persuaded by M.T.'s argument on this factor.

*Factor 6*

The next factor M.T. addresses is the sixth factor. The sixth factor is "[t]he sophistication and maturity of the juvenile as determined by consideration of his home and

9

environmental situation, emotional condition and pattern of living[.]"  § 211.071.6(6).  On this factor, the juvenile court found:

> The [c]ourt considered this issue in the context of the Certification Report, Reports to the [c]ourt and testimony of [Tate] as well as the other evidence in the case.  [Tate] was able to determine from detailed conversations with [M.T.'s] mother and school records that [M.T.] does not have a learning disorder or an I.E.P. ( Individualized Education Program).
>
> As stated above, [M.T.] has a history of behavior issues going back several years.  These issues have included aggressive and assaultive conduct, verbally abusing both student peers and authority figures such as school personnel.
>
> In this case, [M.T.] went to the apartments on East Haven in Caruthersville, Missouri and was drinking alcohol and smoking marijuana while playing video games.  At some point in the night, [M.T.] took the victim's handgun and shot the victim, who was unarmed, six (6) times.  [M.T.] was interviewed about the incident and confessed to murdering the victim.  He further stated he was not upset about the incident but was in shock.  In addition, he stated that he fired the last shot to prevent the neighbors from hearing the victim scream.  [M.T.'s] history and the current allegations involve not only a lack of impulse control representative of a teenager, but are indicative of an increased level of criminal sophistication associated with obtaining and using a firearm, and engaging in illegal and violent behaviors.

According to M.T., the problem with the juvenile court's finding on this factor is that it "relied on [Tate's] testimony that M.T. did not have a learning disorder or an individualized education plan, and on the allegations involving murder."  M.T. claims "[n]either rationale is supported."  Once again, this argument is a request for us to reweigh the evidence; not a demonstration of an abuse of discretion.  While it is true Tate admitted she had no training in juvenile mental health, that admission does not disqualify her testimony but goes to the question of how much weight the juvenile court should give it.  Tate testified she had "worked with a lot of 16 year olds, and [M.T.] seemed to be progressing just like any other 16-year-old did."  She further testified M.T. had "more street smarts" than kids his age and she believed M.T. had a normal level of maturity compared to other children in the delinquency system.  We cannot say the trial court's findings on this factor were in error.

*Factors 8 and 9*

Next, M.T. addresses factors 8 and 9.  These factors instruct the juvenile court to consider the resources available to the juvenile system and whether the juvenile can benefit

10

from the treatment or rehabilitative programs available to the juvenile court.  § 211.071.6(8)-(9).  As to these factors, the juvenile court took into account:  (1) the juvenile's amenability to treatment within existing programs; (2) the physical security of the facilities; and (3) the length of time available for treatment within the juvenile system.  *See A.D.R.,* 603 S.W.2d at 575.  The juvenile court found:

> There are no community services available to this [c]ourt that are designed or suited to address or treat a Juvenile alleged to have committed such violent offenses.  In addition, none of the community services which are provided and available to this [c]ourt are in secure settings, which the [c]ourt deems necessary to ensure the safety of the public.  The only conceivably suitable placement for [M.T.] within the juvenile system were the pending allegations adjudicated and sustained by this [c]ourt, would be the Missouri Division of Youth Services (DYS).  Although the decision of where to place [M.T.] is exclusively that of DYS, a secure DYS facility would likely be the only appropriate setting for [M.T.] in the circumstances before the [c]ourt.  The alleged circumstances of these violent offenses cause the [c]ourt to conclude [M.T.] is not amenable to the types of cognitive and pro-social skill building programs and services that would be offered by DYS, even in a secure facility.
>
> Even though now at 16 years old, he would not have a significant amount of time in DYS care prior to turning 18, and combined with [M.T.'s] history of aggressive, defiant, and violent behaviors, and further combined with the viciousness of the allegations currently before the [c]ourt.  The [c]ourt concludes that the juvenile system is not able to effectively address these issues and rehabilitate [M.T.] while simultaneously keeping its commitment to keep the community safe.

While M.T. points out a number of issues he has with the certification report and with Tate's testimony (e.g., "[Tate] also testified that she had little-to-no substantial training in adolescent brain development"; "[Tate] had no training at all on children's mental health issues"; "[Tate] did not do any specific testing to see if M.T. would be amenable to rehabilitation and treatment in a DYS facility"), these issues once again concern how much weight or credence the juvenile court should have given to Tate's testimony and certification report.  Reweighing that evidence or determining Tate's credibility is not a task we will undertake.  *J.N.W.*, 643 S.W.3d at 631.

11

## Totality of the Circumstances

M.T. does not address factors 1-3, 7, or 10 in point 2.[7]  The seventh factor instructs the juvenile court to consider the juvenile's age.  § 211.071.6(7).  The juvenile court found M.T. was 16 years of age at the time of the alleged murder and was 16 at the time of the hearing.  The tenth factor required the juvenile court to consider racial disparity in certification.  § 211.071.6(10).  The juvenile court found race to have no impact on Ashley's determination of which allegations to make or whether or not to seek certification.

Factors 1 through 3 address the seriousness of the alleged offense; the need for community protection; elements of viciousness, force, and violence; and whether the alleged offense was against a person rather than property.  § 211.071.6(1)-(3).  "The first three factors contain some of the most critical considerations in certification."  **T.D.S.**, 643 S.W.3d at 527.  While M.T. argues that the seriousness of the alleged offense (factor 1) overshadowed the other factors and the focus of the certification proceeding should be on the juvenile rather than the conduct alleged in the petition, "[t]he first factor, the seriousness of the alleged offense is a 'dominant criterion among the ten factors.'"  **Id.** (quoting **State v. Thomas**, 70 S.W.3d 496, 504 (Mo. App. E.D. 2002)).

The juvenile court made findings M.T. was alleged to have committed the Class A felony of murder in the first degree by shooting Briscoe six times.  The findings stated it was alleged Briscoe was unarmed, shot with his own gun, and the murder occurred at Briscoe's residence.  Here, the alleged offense is first-degree murder, an extremely serious offense, and it was within the juvenile court's discretion to give this factor significant weight.  As to factor 2, the juvenile court found the alleged offense "involved viciousness, force, and violence."  In deciding whether to dismiss the juvenile action, the juvenile court also gave "greater weight" to the third factor

---

[7] For ease of analysis, we address these factors out of order.

that the alleged offense was against a person rather than against property.  It was within the juvenile court's discretion to give that factor, as well as factors 1 and 2, more weight.

The juvenile court conducted a full hearing complying with due process and fair treatment and assessed each factor listed in section 211.071.  M.T. has not demonstrated the juvenile court abused its discretion based on the totality of the circumstances in dismissing M.T.'s juvenile case and certifying him to be tried as an adult.  Point 2 is denied.

## Conclusion

The juvenile court's judgment is affirmed.


MARY W. SHEFFIELD, J. – OPINION AUTHOR

JACK A. L. GOODMAN, C.J. – CONCURS

JEFFREY W. BATES, J. - CONCURS