STATE ex rel. Christopher
SIMMONS, Petitioner,

v.

Donald P. ROPER, Superintendent,
Potosi Correctional Center,
Respondent.

No. SC 84454.

Supreme Court of Missouri,
En Banc.

Aug. 26, 2003.

Jennifer L. Brewer, St. Louis, Patrick J. Berrigan, Watson & Dameron, L.L.P., Kansas City, for Petitioner.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stephen D. Hawke, Assistant Attorney General, Jefferson City, for Respondent.

Elizabeth Unger Carlyle, Lee's Summit, for Amicus Curiae American Civil Liberties Union.

LAURA DENVIR STITH, Judge.

Christopher Simmons was sentenced to death for a murder he committed when he was 17 years old. He argues that to execute him for a crime committed when he was under 18 constitutes cruel and unusual punishment.

In *Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), the Supreme Court of the United States held that it constituted cruel and unusual punishment to execute persons who were 15 years of age or younger at the time of their offense. The following year, in *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), the Supreme Court held that there was not then a national consensus against the execution of those who were 16 or 17 years old at the time of their crimes and declined to bar such executions. On that same day, the Supreme Court held that there was not then a national consensus to bar the execution of those who were mentally retarded. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

In 1993, Christopher Simmons murdered Shirley Crook. Because of *Stanford,* he did not argue that his age constituted a bar to imposition of the death penalty, although he did argue that his age

was a mitigating circumstance. He was convicted of first-degree murder and sentenced to death in accordance with the jury's verdict. This Court affirmed his conviction and death sentence, as well as the denial of post-conviction relief. *State v. Simmons,* 944 S.W.2d 165 (Mo. banc 1997), *cert. denied,* 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997).[1]

Last year, in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court held that a national consensus had emerged against the execution of mentally retarded offenders since *Penry.* Mr. Simmons now asks us to hold that a similar consensus against the execution of juveniles has developed since *Stanford,* that the rationale for the Supreme Court's determination that the execution of juveniles was not cruel and unusual punishment has disappeared, and that the Eighth Amendment bars his execution.

 This Court agrees. Applying the approach taken in *Atkins,* this Court finds that, in the fourteen years since *Stanford* was decided, a national consensus has developed against the execution of juvenile offenders, as demonstrated by the fact that eighteen states now bar such executions for juveniles, that twelve other states bar executions altogether, that no state has lowered its age of execution below 18 since *Stanford,* that five states have legislatively or by case law raised or established the minimum age at 18, and that the imposition of the juvenile death penalty has become truly unusual over the last decade.[2]

1. The facts underlying Mr. Simmons' crime and conviction are set out in detail in that opinion and will not be repeated here.

2. The terms "juvenile death penalty" and "juvenile executions" are terms of art used to refer to the execution of those who were under age 18 at the time of their crimes. The

term "juvenile" is therefore used in this opinion to refer to those under age 18 when they committed their crime, although the Court recognizes that, for purposes of juvenile division jurisdiction, 17–year–olds are not considered juveniles in Missouri. *Sec.* 211.031. Various other states that also treat 17–year–

Accordingly, this Court finds the Supreme Court would today hold such executions are prohibited by the Eighth and Fourteenth Amendments. It therefore sets aside Mr. Simmons' death sentence and resentences him to life imprisonment without eligibility for probation, parole, or release except by act of the Governor.

## I. RETROACTIVE APPLICATION OF JUVENILE DEATH PENALTY

█ The state contends that this Court should not reach the substantive issue whether the execution of persons for crimes committed as juveniles is prohibited by the Eighth and Fourteenth Amendments, because Mr. Simmons is barred from raising it since he did not do so at the time of his trial. We reject this argument.

In *Penry,* before reaching the substantive issue whether the Eighth Amendment prohibited the execution of the mentally retarded, the Supreme Court considered whether a decision barring such executions would apply retroactively under the principles set out in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Penry* answered the question in the affirmative, stating, "[T]he first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Id.* at 330, 109 S.Ct. 2934. The Supreme Court concluded:

Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review.

*Id.*

*Penry* went on to hold that no national consensus against the execution of the mentally retarded existed in 1989. But, *Atkins* found that such a consensus had developed by 2002 and that the Eighth Amendment " 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Atkins,* 536 U.S. at 321, 122 S.Ct. 2242, *quoting, Ford v. Wainwright,* 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). In *Johnson v. State,* 102 S.W.3d 535, 539–40 (Mo. banc 2003), this Court determined that *Atkins* applied retroactively. *Accord Van Tran v. State,* 66 S.W.3d 790, 811 (Tenn.2001) (holding prior to *Atkins* that new rule barring execution of mentally retarded would be applied retroactively).

In parallel fashion, if, as a substantive matter, the Eighth Amendment prohibits the execution of persons under age 18 at the time of their offense regardless of the procedures followed, then such a rule would also fall under the first exception to nonretroactivity under *Teague* because it would deprive the state of the power to impose the punishment of death on such a

olds as adults for purposes of juvenile court jurisdiction nonetheless do not have a juvenile death penalty—that is, they bar the execution of those under 18 at the time of their crimes. *See* Office of Juvenile Justice and Delinquency Prevention, *OJJDP Statistical Briefing Book* (Apr. 25, 2002), *at* http://ojjdp.ncjrs.org/ojst-atbb/html/qa085.html. Of course, 16–year-olds are also now subject to the death penalty in Missouri even though they *are* considered

juveniles by Missouri's court system, although they can be certified to stand trial as an adult. *Sec.* 211.071. In Missouri, a 15–year–old can also be certified for trial as an adult but cannot be subjected to the death penalty. *Id.* Self-evidently, the death penalty presents different issues than does the issue of who is a juvenile for purposes of juvenile division jurisdiction.

person. *Cf. Penry*, 492 U.S. at 330, 109 S.Ct. 2934. Such a rule would therefore be applicable to persons, such as Mr. Simmons, whose cases are on collateral review, and the usual waiver rules will not apply.[3] *See also Reed v. Ross*, 468 U.S. 1, 16, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures.").

## II. NATIONAL CONSENSUS AGAINST EXECUTION OF JUVENILES AND THE MENTALLY RETARDED

To determine whether the application of the death penalty to juveniles constitutes cruel and unusual punishment, it is helpful to examine the Supreme Court's decisions in prior cases addressing the execution of juveniles and of the mentally retarded.

### A. The Death Penalty for Juveniles: Thompson and Stanford.

*1. Thompson v. Oklahoma.* In *Thompson*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), the Supreme Court determined that the Eighth Amendment categorically prohibits the execution of those who were 15 years old or younger at the time of their crimes. Using an approach similar to that which he would utilize in *Atkins* some fourteen years later, Justice Stevens, in the principal opinion, said that in determining what constitutes cruel and unusual punishment, judges should be "guided by the 'evolving standards of decency that mark the progress of a maturing society.'" *Id.* at 821, 108 S.Ct. 2687, *quoting, Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630

(1958). Such standards cannot remain static, but must " 'acquire meaning as public opinion becomes enlightened by humane justice,' " for " 'a principle to be vital must be capable of wider application than the mischief which gives it birth.' " *Id.* at 821 n. 4, 108 S.Ct. 2687, *quoting, Weems v. United States*, 217 U.S. 349, 373, 378, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

To determine current standards of decency, *Thompson* examined: (a) relevant legislative enactments, and (b) evidence of how juries viewed the propriety of execution of the mentally retarded. It also considered (c) the views of respected national and international organizations. Finally, in light of the above and other factors, (d) the Supreme Court made its own judgment as to the propriety of such executions and explained "why these indicators of contemporary standards of decency confirm our judgment that such a young person is not capable of acting with the degree of culpability that can justify the ultimate penalty." *Thompson*, 487 U.S. at 822–23, 108 S.Ct. 2687.

*a. Legislative Enactments.* In reviewing statutes governing punishment of children, *Thompson* found that "[t]he line between childhood and adulthood is drawn in different ways by various States." *Id.* at 824, 108 S.Ct. 2687. Fourteen state legislatures then barred capital punishment altogether. *Id.* at 826, 108 S.Ct. 2687. In nineteen other states, the legislature permitted capital punishment, but state statutes failed to expressly state the minimum age for its imposition. *Id.* at 826–27, 108 S.Ct. 2687. Eighteen remaining states set a minimum age, varying from 16 to 18. *Id.* at 829, 108 S.Ct. 2687. No legislature

---

**3.** Because, here, *Teague* requires retroactive application, and because state courts cannot apply retroactivity principles more narrowly than did *Teague*, there is no need to undertake the *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), analysis discussed by this Court in *State v. Whitfield*, 107 S.W.3d 253, 267–68 (Mo. banc 2003).

had adopted a statute explicitly permitting the execution of those under age 16. *Id.*

b. *Imposition of the Death Penalty.* *Thompson* also found that juries rarely imposed the death penalty on those under 16, that only eighteen to twenty such persons had been executed in the 20th century, and only one since 1948. *Id.* at 832, 108 S.Ct. 2687. Between 1982 and 1986, only five persons age 15 or younger were sentenced to death in the United States, leading the Court to conclude that, "these five young offenders have received sentences that are 'cruel and unusual in the same way that being struck by lightning is cruel and unusual.'" *Id.* at 833, 108 S.Ct. 2687, *quoting, Furman v. Georgia,* 408 U.S. 238, 309, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (quoting Stewart, J., concurring).

c. *National and International Views.* As a part of its discussion of legislation, the Supreme Court considered the views of respected national religious, social, and professional organizations, including the American Bar Association ("ABA") and the American Law Institute, both of which it said "have formally expressed their opposition to the death penalty for juveniles." *Id.* at 830, 108 S.Ct. 2687. And, stating that it had "previously recognized the relevance of the views of the international community in determining whether a punishment is cruel and unusual," *id.* at 830 n. 31, 108 S.Ct. 2687 (citations omitted), the Court also considered the sentencing practices of European and other countries, stating:

> Although the death penalty has not been entirely abolished in the United Kingdom or New Zealand (it has been abolished in Australia, except in the State of New South Wales, where it is available for treason and piracy), in neither of those countries may a juvenile be executed. The death penalty has been abolished in West Germany, France, Portugal, The Netherlands, and all of the Scandinavian countries, and is available only for exceptional crimes such as treason in Canada, Italy, Spain, and Switzerland. Juvenile executions are also prohibited in the Soviet Union.

*Id.* at 830–31, 108 S.Ct. 2687 (footnote omitted).

d. *Independent Analysis.* Lastly, *Thompson* analyzed the culpability of juveniles as compared to adults and considered whether application of the death penalty to juveniles measurably contributed to the social purposes it was intended to serve. After noting "broad agreement on the proposition that adolescents as a class are less mature and responsible than adults" and "the special mitigating force of youth," the Court concluded that "less culpability should attach to a crime committed by a juvenile." *Id.* at 834–35, 108 S.Ct. 2687. As to the social rationales of the death penalty—retribution and deterrence—it found them unacceptable for 15–year–old offenders because of the "lesser culpability of the juvenile offender" and because deterrence would not be jeopardized if the execution of those under 16 were prohibited. *Id.* at 836–37, 108 S.Ct. 2687.

In light of all of these factors, *Thompson* concluded that a national consensus existed that execution of persons under 16 at the time of their crimes constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Id.*

2. *Stanford v. Kentucky.* The following year, in *Stanford,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306, Justice Scalia stated in the principal opinion that, by contrast, the Eighth and Fourteenth Amendments did not prohibit imposition of the death penalty for crimes committed at age 16 or 17. *Id.* at 370–77, 109 S.Ct. 2969. In so holding, Justice Scalia agreed

that what constitutes cruel and unusual punishment must be determined by current standards rather than by those in effect in 1789. *Id.* But, he said, current standards are almost entirely to be determined by reference to "statutes passed by society's elected representatives," *id.* at 370, 109 S.Ct. 2969, and specifically by state legislatures. He then noted that, while the majority of states did not permit the execution of juvenile offenders, that count included the fourteen states that then barred capital punishment altogether. *Id.* at 370 n. 2, 109 S.Ct. 2969. If one considered only those states permitting capital punishment, then the majority of that subgrouping approved the execution of those who were 16 or 17 at the time of their offense. *Id.* at 370, 109 S.Ct. 2969.

And, although *Stanford* recognized that juries sentence substantially fewer juveniles than adults to death, it said this did not provide a reason to prohibit such death sentences entirely. *Id.* at 373–74, 109 S.Ct. 2969. *Stanford* also rejected, as irrelevant, the many state statutes barring those under 18 years old from engaging in various activities, such as voting, drinking, or driving. *Id.* at 374–77, 109 S.Ct. 2969. Similarly, although a year earlier *Thompson* had said the views of social, professional, and religious groups, as well as the sentencing practices of other countries, were relevant to determining current standards of decency, *Stanford* stated that the views of national organizations were an "uncertain foundation" on which to base constitutional law and that *international* practices were simply irrelevant to whether a *national* consensus existed. *Id.* at 369 n. 1, 377, 109 S.Ct. 2969. After so limiting its inquiry, *Stanford* concluded that there was no national consensus against executing offenders who were 16 or 17 at the time of the offense. *Id.* at 370–72, 379–80, 109 S.Ct. 2969.

*B. From Penry to Atkins: Development of a National Consensus Against Execution of the Mentally Retarded.*

*1. Penry v. Lynaugh.* The same day that the Supreme Court held in *Stanford* that there was no national consensus against imposition of the death penalty on juveniles, it held in *Penry*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256, an opinion authored by Justice O'Connor, that there was also no national consensus against imposition of the death penalty on the mentally retarded. Like *Thompson* and *Stanford*, *Penry* recognized that what constitutes cruel and unusual punishment is not a static concept, immutably tied to what punishments would have been included within the reach of the Eighth Amendment when the Bill of Rights was adopted in 1789. *Id.* at 330, 109 S.Ct. 2934. Rather, the "prohibition against cruel and unusual punishments also recognizes the 'evolving standards of decency that mark the progress of a maturing society.'" *Id.* at 330–31, 109 S.Ct. 2934, *quoting, Trop,* 356 U.S. at 101, 78 S.Ct. 590. And, like *Stanford*, *Penry* looked to statutes passed by state legislatures as the best type of "objective evidence of how our society views a particular punishment today." *Id.* at 331, 109 S.Ct. 2934. *Penry* also said that the Court "looked to the data concerning the actions of sentencing juries." *Id.*

*a. Legislative Action.* When *Penry* was decided in 1989, only Georgia, Maryland, and the federal government had statutes barring the imposition of the death penalty on the mentally retarded. *Id.* at 334, 109 S.Ct. 2934. The Supreme Court concluded that "the two state statutes prohibiting execution of the mentally retarded, even when added to the 14 States that have rejected capital punishment completely, do not provide sufficient evidence

*at present* of a national consensus." *Id.* (emphasis added).

b. *Other Factors.* Mr. Penry was unable to provide evidence that juries chose not to sentence mentally retarded defendants to death. In addition, on the record before it, the Supreme Court said it could not conclude that "all mentally retarded people, by definition, can never act with the level of culpability associated with the death penalty." *Id.* at 338–39, 109 S.Ct. 2934. For these reasons, the Court determined that "at present, there is insufficient evidence of a national consensus against executing mentally retarded people convicted of capital offenses for us to conclude that it is categorically prohibited by the Eighth Amendment." *Id.* at 335, 109 S.Ct. 2934.

2. *Atkins v. Virginia.* In 2002, the Supreme Court revisited the issue of capital punishment of the mentally retarded in the case of Daryl Atkins, an allegedly mentally retarded man whose death sentence had been affirmed by the Virginia Supreme Court based on *Penry's* determination that there is no national consensus against the execution of the mentally retarded. In a principal opinion by Justice Stevens, the Supreme Court reversed Mr. Atkins' death sentence and remanded for a determination of his mental status. *Atkins,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. In so holding, *Atkins* reaffirmed that whether capital punishment is barred for certain classes of offenders is necessarily part of a fluid, rather than a static, process and that as our standards of decency evolve, so will the determination of what constitutes cruel and unusual punishment. *Id.* at 312, 122 S.Ct. 2242.

*Atkins'* analysis more closely resembles that in *Thompson* than that in *Stanford. Atkins:* (a) first looked at the objective evidence of legislative intent provided by state legislation barring the death penalty. (b) Like *Penry,* it considered the frequency with which the death penalty was imposed on the mentally retarded. (c) It then looked to the opinions of national professional, religious, and social organizations, and the approach of other countries to the death penalty for the mentally retarded. (d) Finally, it undertook an independent examination of whether the imposition of the death penalty on the mentally retarded constitutes cruel and unusual punishment under today's evolving standards of decency. *Id.* at 313, 122 S.Ct. 2242.

a. *Legislative Action. Atkins* found that, in the thirteen years after *Penry,* fourteen more states—including Missouri—had adopted legislation barring the application of their death penalty laws to the mentally retarded. And, while New York and Nebraska had each reinstated the death penalty, each had specifically exempted the mentally retarded from the reach of those newly enacted statutes. *Id.* at 314–15, 122 S.Ct. 2242. When these sixteen new states were added to the two states that had already adopted such legislation in 1989, eighteen states, and the federal government, then prohibited imposition of the death penalty on the mentally retarded. *See id.* In addition, the Court noted that the Texas legislature had unanimously adopted a bill barring the execution of the mentally retarded, but the bill was vetoed by the governor on other grounds, and that at least one house of the Virginia and Nevada legislatures had similarly adopted bills barring the death penalty for the mentally retarded. *Id.* at 315, 122 S.Ct. 2242.[4]

---

**4.** In footnote 18, *Atkins* contrasted these substantial legislative changes with the fact that, since *Stanford,* "apparently only two state legislatures have raised the threshold age for imposition of the death penalty" for juveniles, but did not purport to present a complete

While the number of states barring imposition of the death penalty had clearly grown impressively, the Court stated that, *"It is not so much the number of these States that is significant, but the consistency of the direction of change." Id.* (footnote omitted) (emphasis added). This consistency was further reflected by the fact that, since *Penry,* no state had adopted a law permitting the execution of the mentally retarded. *Id.* at 315–16, 122 S.Ct. 2242. The Court found such consistency particularly persuasive given the anticrime atmosphere of the times:

> Given the well-known fact that anticrime legislation is far more popular than legislation providing protections for persons guilty of violent crime, the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal.

*Id.*

b. *Frequency of Imposition of Death Penalty.* The Court found that some states, such as New Hampshire and New Jersey, whose statutes nominally authorize the execution of mentally retarded persons, had not carried out executions of any persons in decades, thus removing the incentive to pass legislation barring execution of the mentally retarded in particular. *Id.* at 316, 122 S.Ct. 2242. And, in those states that still carried out executions, the Court found, the practice of executing mentally retarded offenders had become very uncommon: only five persons who were known to have an I.Q. of less than 70 had been executed in the thirteen years since *Penry. Id.* The Court concluded that "[t]he practice ... has become truly unusual, and it is fair to say that a national consensus has developed against it." *Id.*

c. *National and International Opposition to Death Penalty. Atkins* stated that the consensus against the death penalty for the mentally retarded was evident not only from the legislation passed over the prior thirteen years, and the rareness of the application of the death penalty in those states that permitted its use, but also from the opposition to the practice from experts in the field, noting "several organizations with germane expertise have adopted official positions opposing the imposition of the death penalty upon a mentally retarded offender," including the American Psychological Association and the American Association of Mental Retardation. *Id.* at 316 n. 21, 122 S.Ct. 2242. The Court also found the sentiments of this nation's religious communities, and of the world community, to be overwhelmingly opposed to execution of the mentally retarded. *Id.* Finally, the Court cited to polling data that showed "a widespread consensus among Americans, even those who support the death penalty, that executing the mentally retarded is wrong." *Id.* While the Court stated that the opposition of these groups was by no means dispositive, the Court did find significant their "consistency with the legislative evi-

---

picture of the legislative activity on the juvenile death penalty since *Stanford,* an issue not then before it. *Atkins,* 536 U.S. at 316 n. 18, 122 S.Ct. 2242 (citations omitted). As discussed *infra,* eleven states and the federal government already barred the death penalty for juveniles when *Stanford* was decided, two have done so since, others are considering doing so, two other legislatures have enacted statutes that do not permit execution of those under 18, and the state of Washington has barred juvenile executions by court decision. It is noteworthy that twelve additional states and the District of Columbia bar executions altogether.

dence," stating that it provided "further support to [the Court's] conclusion that there is a consensus among those who have addressed the issue." *Id.*

d. *Independent Judicial Determination.* Finally, the Supreme Court undertook an independent evaluation of whether such executions should be prohibited. It found that neither the retributive nor the deterrence justifications for the death penalty would be furthered by executing the mentally retarded, stating, "If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution." *Id.* at 319, 122 S.Ct. 2242.[5] It further concluded, "the same cognitive and behavioral impairments that make [mentally retarded] defendants less morally culpable ... also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Id.* at 320, 122 S.Ct. 2242.

The Court further implicitly rejected the suggestion in *Penry* that the death penalty could not be barred if any mentally retarded person might theoretically deserve it, so that the effect of mental retardation should instead simply be considered as a mitigating factor. *Id.* at 318–19, 122 S.Ct. 2242. Rather, it said, the very fact that persons are mentally retarded not only makes them more likely to give a false confession, but also makes them less able to assist their counsel, typically makes them poor witnesses, and may cause them to exhibit a demeanor that is unsympathetic and that may incorrectly imply a lack of remorse. *Id.* at 320–21, 122 S.Ct. 2242.

Its independent evaluation led the Court to conclude that "death is not a suitable punishment for a mentally retarded criminal." *Id.* at 321, 122 S.Ct. 2242.

## III. APPLICATION OF THE PRINCIPLES SET OUT IN ATKINS, THOMPSON, PENRY, AND STANFORD TO THE EXECUTION OF JUVENILES TODAY

A. *Stanford Does Not Preclude This Court from Considering Whether a National Consensus Now Exists Barring the Death Penalty for Juveniles.*

■ The state argues, and the dissenting judges would hold, that whatever the Supreme Court held in *Atkins* is irrelevant to the instant case because this Court is bound by *Stanford* to hold that there is no constitutional bar to the execution of persons who were 16 or 17 years of age at the time of their crimes. This argument ignores the fundamental premise on which *Stanford*, as well as *Thompson, Penry,* and *Atkins,* were based: that "this Court has not 'confined the prohibition embodied in the Eighth Amendment to 'barbarous' methods that were generally outlawed in the 18th century,' but instead has interpreted the Amendment 'in a flexible and dynamic manner.'" *Stanford,* 492 U.S. at 369, 109 S.Ct. 2969, *quoting, Gregg v. Georgia,* 428 U.S. 153, 171, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Courts should be guided by the conceptions of decency of "modern American society as a whole." *Id.* (footnote omitted).

*Atkins* recently reaffirmed that decisions as to standards of decency are to be decided by current standards, not ones of years ago. *Atkins,* 536 U.S. at 312, 122

---

**5.** In *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Supreme Court set aside a death sentence because the petitioner's crimes did not reflect "a consciousness materially more 'depraved' than that of any person guilty of murder." *Id.* at 433, 100 S.Ct. 1759.

S.Ct. 2242. And, that is just what the issue before this Court requires us to do: determine whether the evolving national consensus bars the imposition of the death penalty on juveniles today, even though it did not bar it fourteen years ago. To say that this determination must be made based on the state of the law and standards that existed when *Stanford* was decided in 1989, and that to do otherwise is to overrule *Stanford*, is simply incorrect. This Court clearly has the authority and the obligation to determine the case before it based on current—2003—standards of decency. *See Patterson v. Texas*, 536 U.S. 984, 985, 123 S.Ct. 24, 24, 153 L.Ed.2d 887 (2002) (Ginsburg, J., dissenting from denial of petition for writ) ("This Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), made it tenable for a petitioner to urge reconsideration of *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). . . ."); *In re Stanford*, 537 U.S. 968, 123 S.Ct. 472, 154 L.Ed.2d 364 (2002) (Stevens, J., dissenting from denial of petition for writ) (Court should reconsider *Stanford* in light of *Atkins* because "even if we were not convinced in 1989 [that juveniles should not be subject to the death penalty] we should be all the more convinced today" because of the additional states barring such executions and because of the growth in scientific knowledge of the less than fully developed nature of the adolescent brain.).[6]

*B. A National Consensus Against the Juvenile Death Penalty.*

 As the discussion of *Thompson, Stanford, Penry,* and *Atkins* makes evident, many of the same principles and factors that have guided the Supreme Court's determination of the constitutionality of the death penalty for the mentally retarded have also guided the Supreme Court's determination of the constitutionality of the death penalty for juveniles. This Court therefore will use *Atkins'* approach in addressing whether a national consensus has developed against the juvenile death penalty since *Stanford*, looking at: (1) the extent of legislative action against or in favor of the juvenile death penalty; (2) the frequency of the imposition of the death penalty on juveniles in modern times, and the frequency with which it is carried out even when imposed; (3) national and international opinion on the juvenile death penalty; and (4) an independent examination of whether the death penalty for juveniles violates evolving standards of decency and so is barred by the Eighth and Fourteenth Amendments.

*1. Legislative Action Has Consistently Been Against the Juvenile Death Penalty.* At the time that *Penry* was decided in 1989, only two states had outlawed executing the mentally retarded, and the Supreme Court found that this was not sufficient to constitute a national consensus. In deciding that developments of the inter-

---

**6.** The dissent's suggestion that this Court should infer that the Supreme Court would not apply the *Atkins* principles to the juvenile execution context because the Supreme Court has denied petitions for writs in *Patterson, Stanford,* and similar cases involving juveniles itself ignores the fact that the Supreme Court "has rigorously insisted that such a denial carries no implication whatever regarding the Court's views on the merits of the case which it has declined to review. The Court has said this again and again; again and again the

admonition has to be repeated." *Maryland v. Baltimore Radio Show*, 338 U.S. 912, 919, 70 S.Ct. 252, 94 L.Ed. 562 (1950); *see also Teague v. Lane*, 489 U.S. 288, 296, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (because a variety of considerations underlie the denial of a writ, such denials should be accorded no precedential value). *Cf. Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 61 (Mo. banc 1999) (denial of petition for writ is not a conclusive decision on the merits of the issue presented).

vening years between *Penry* and *Atkins* demonstrated that a national consensus had developed against executing the mentally retarded, *Atkins* relied heavily on the fact that sixteen more state legislatures had barred execution of the mentally retarded, while no additional states had permitted it. It found this persuasive not principally because of the number of states that had passed such laws, but because of the consistency of the changes in the direction of opposition to the death penalty for the mentally retarded.

That same consistency of change has been shown in opposition to the juvenile death penalty. Indeed, the change was in the process of occurring when *Stanford* was decided. At the time of *Stanford*, eleven states barred the juvenile death penalty. This was substantial, but not yet enough to constitute a national consensus.

Since *Stanford*, however, and despite what *Atkins* called the popularity of "law and order" legislation, five more states have banned the practice of executing juvenile offenders. Two have done so by adopting legislation raising the age of execution to 18,[7] and two have done so by newly reinstating the death penalty, but only for those offenders who were 18 or older at the time of their offense.[8] The Washington Supreme Court has also held that its death penalty statute cannot be construed to authorize imposition of the death penalty for crimes committed by juvenile offenders,[9] thereby adding the state of Washington to the list of states in which the practice is now prohibited. Thus, a total of sixteen states—to which should be added federal civilian and military courts—require a minimum age of 18 for imposition of the death penalty, only two fewer than the eighteen states *Atkins* identified as prohibiting execution of the mentally retarded.[10] If the twelve states and the District of Columbia that bar the death penalty entirely are added, the combined total is twenty-eight states that prohibit juvenile executions—two fewer than the thirty states that prohibited execution of the mentally retarded at the time *Atkins* was decided.

Moreover, as is the case with the mentally retarded, the change has consistently been in the same direction. No state since *Stanford* has lowered the age for execution from 18 to 17 or 16, although *Stanford* allowed states to do so.[11] Rather, the minimum age has either stayed the same or been raised, and the only two states to reinstate the death penalty since 1989 did

7. Indiana (S. 426, 112th Leg., Reg. Sess., 2002 In. Laws) and Montana (H.B. 374, 1999 Leg., Reg. Sess., 1999 Mt. Laws).

8. Kansas (Kan. Crime. Code Ann. sec. 21–46622 (Vernon 2001)) and New York (N.Y.Crim. Proc. Law sec. 400.27 (McKinney 2002)).

9. *See State of Washington v. Furman*, 122 Wash.2d 440, 858 P.2d 1092, 1102–03 (1993).

10. While, as noted in footnote 18 of *Atkins*, this means there were many fewer states that raised their minimum age of execution to 18 after *Stanford* than there were states that barred the death penalty for the mentally retarded after *Penry*, this in part reflects the fact that eleven states had already acted to bar the juvenile death penalty before *Stanford* was even decided. It would be the ultimate in irony if the very fact that the inappropriateness of the death penalty for juveniles was broadly recognized sooner than it was recognized for the mentally retarded were to become a reason to continue the execution of juveniles now that the execution of the mentally retarded has been barred.

11. Victor L. Streib, *The Juvenile Death Penalty Today: Death Sentences and Executions for Juvenile Crimes*, January 1, 1973–June 30, 2003, at 7, available at http://www.law.onu.edu/faculty/streib/juvdeath (last modified July 1, 2003).

so only for those 18 or older. In addition, many states, including Missouri, have recently considered legislation to raise the minimum age for executions to 17 or 18. *Streib, supra,* at 7. This accounts for the most legislative attention to the issue in twenty years. *Id.* In 2000, a bill to abolish the death penalty in New Hampshire passed both houses of the state legislature, but was vetoed.[12]

█ *2. Infrequency of Imposition of Death Penalty.* In *Atkins,* the Supreme Court also found persuasive the fact that execution of the mentally retarded had become truly unusual. Many states that nominally had the death penalty on their books no longer imposed it at all or had never imposed it on a mentally retarded person, and only a total of five persons known to be mentally retarded had been executed in the United States in the thirteen years following the Court's decision in *Penry. Atkins,* 536 U.S. at 316, 122 S.Ct. 2242.

The practice of executing those under 18 has become similarly uncommon today. Although twenty-two states theoretically permit the death penalty for juveniles, only six (Missouri, Texas, Virginia, Georgia, Oklahoma, and Louisiana) have actually executed a juvenile offender since *Stanford* was decided fourteen years ago. *Streib, supra,* at 3–4. Of these six states, only three have executed juvenile offenders since 1993—Texas, Virginia, and Oklahoma. *Id.* at 4. Louisiana last executed a juvenile offender in 1990; Georgia in 1993.

*Id.* at 3. Missouri executed Frederick Lashley in 1993. That is the only officially recorded execution of a juvenile offender in Missouri since the state took over executions from Missouri's counties in 1937.[13]

Perhaps most telling is that, while at least 366 juvenile offenders have been executed in this country since 1642 (when the first juvenile offender execution occurred), only twenty-two of the 366 were carried out during the current era (1973–2003). *Id.* Of these twenty-two executions, Texas, Virginia, and Oklahoma together account for eighty-one percent of the juvenile executions. *Id.* at 5. Although Alabama, Arizona, Arkansas, Delaware, Idaho, Kentucky, Mississippi, Nevada, Pennsylvania, South Dakota, Utah, and Wyoming all theoretically permit the death penalty for 16–year–olds, and while Florida, New Hampshire, and North Carolina theoretically permit it for 17–year–olds, none of these states has executed a juvenile since the death penalty was re-established in 1976. *Id.* at 3–4, 6. All but South Dakota and New Hampshire, however, have executed other offenders during that period.[14] Indeed, even where juries have imposed a death sentence on a juvenile since the reinstatement of the death penalty in 1976, its application has consistently been reversed by the courts on a variety of grounds, making South Carolina the only other state (other than Texas, Louisiana, Missouri, Georgia, Virginia, and Oklahoma) to carry out a juvenile execution since 1976. *Id.* at 3. As the chart attached

---

**12.** HB 1548 (N.H.2000).

**13.** According to one authority, the only other juvenile execution in Missouri occurred in 1921. American Bar Association, *Cruel and Unusual Punishment: The Juvenile Death Penalty,* Spring 2003, at 2, *available at* http://www.abanet.org/crimjust/juvjus/ factsh-

eets-evolving-standards.pdf (last visited Aug. 1, 2003).

**14.** These and other statistics about executions are collected by the Death Penalty Information Center and can be found at www.deathpenaltyinfo.org. *See also* statistics collected at http://www.asc41.com/policypaper2.html by the American Society of Criminology.

as Appendix A graphically demonstrates, more mentally retarded persons than juveniles have been executed, in more states, since the death penalty was reinstated in 1976.[15]

As *Atkins* noted in regard to the mentally retarded, in light of the small number of executions of juvenile offenders carried out in the last decade, legislatures in states with a juvenile death penalty may have seen little reason to pass legislation barring it. Juveniles are so seldom executed that, other than perhaps in Texas and Virginia, the death penalty for juveniles has become so truly unusual that its potential application is more hypothetical than real.

But, the likelihood of such an execution is not hypothetical in Missouri today. The state argues that Missouri should become the only state other than Texas, Virginia, and now Oklahoma to carry out more than one juvenile execution since the reinstatement of the death penalty in 1976.

■ *3. National and International Consensus.* Opposition to the juvenile death penalty by professional, social, and religious organizations has been longstand-

ing. At the time *Stanford* was decided, a large number of groups, including the ABA, child advocacy groups, psychiatric organizations, and church and religious groups filed amicus briefs urging an end to such executions.[16] Since *Stanford,* additional organizations of professionals have also called for an end to the death penalty, including: The American Psychiatric Association, The American Academy of Child and Adolescent Psychiatry, The National Mental Health Association, The National Center for Youth Law, The Coalition for Juvenile Justice, The American Humane Association, and The Constitutional Project (a bipartisan nonprofit organization that seeks consensus on controversial legal and constitutional issues).

Additional groups of faith also have issued statements in opposition to the death penalty, including: American Baptist Churches in the USA, American Ethical Union, American Friends Service Committee, American Jewish Committee, Amnesty International, The Bruderhof Communities, Central Conference of America, Christian Church (Disciples of Christ), Church of the Brethren, Church Women

---

**15.** ABA Juvenile Justice Center, *Comparison: Executions of Juveniles and Mentally Retarded Persons by State Since 1976* (Feb. 20, 2003), *at* http://www.abanet.org/crimjust/juvjus/juvandmr.pdf.

**16.** *Stanford* cited the following list of organizations, all of which filed briefs *amicus curiae* in support of the petitioners in *Stanford:* American Bar Association; Child Welfare League of America; National Parents and Teachers Association; National Council on Crime and Delinquency; Children's Defense Fund; National Association of Social Workers; National Black Child Development Institute; National Network of Runaway and Youth Services; National Youth Advocate Program; and American Youth Work Center; American Society for Adolescent Psychiatry and American Orthopsychiatric Association; Defense for Children International—USA; National Legal Aid and Defender Association;

and National Association of Criminal Defense Lawyers; Office of Capital Collateral Representative for the State of Florida; International Human Rights Law Group; American Baptist Churches; American Friends Service Committee; American Jewish Committee; American Jewish Congress; Christian Church (Disciples of Christ), Mennonite Central Committee; General Conference Mennonite Church; National Council of Churches; General Assembly of the Presbyterian Church; Southern Christian Leadership Conference; Union of American Hebrew Congregations; United Church of Christ Commission for Racial Justice; United Methodist Church General Board of Church and Society; and United States Catholic Conference; West Virginia Council of Churches; and Amnesty International. *Stanford,* 492 U.S. at 388 n. 4, 109 S.Ct. 2969 (Brennan, J. dissenting).

United, The Episcopal Church, Evangelical Lutheran Church in America, Fellowship of Reconciliation, Friends Committee on National Legislation, Friends United Meeting, General Conference of General Baptists, General Conference Mennonite Church, The Mennonite Church, The Moravian Church in America, YMCA of the USA, Mormons for Equality and Social Justice, The Orthodox Church in America, National Council of the Churches of Christ, Presbyterian Church (USA), The Rabbinical Assembly, Reorganized Church of Jesus Christ of Latter Day Saints, Reformed Church in America, Unitarian Universalist Association, Union of American Hebrew Congregations, United Methodist Church, United Church of Christ, and United States Catholic Conference.[17] A recent poll found that only thirty-four percent of Missourians support the death penalty for juveniles.[18]

While *Stanford* found the opposition of social, professional, and religious groups to be of little importance, the Court's more recent decision in *Atkins* clearly demonstrated a shift back to reliance on such evidence to confirm the national consensus that evolving standards of decency proscribe imposition of the death penalty on the mentally retarded. *Atkins,* 536 U.S. at 316 n. 21.

Similarly, here, although by no means dispositive, we find the opposition to the juvenile death penalty of the wide array of groups within the United States listed above to be consistent with the legislative and other evidence that current standards of decency do not permit the imposition of the death penalty on juveniles. We also find of note that the views of the international community have consistently grown in opposition to the death penalty for juveniles. Article 37(a) of the United Nations Convention on the Rights of the Child and several other international treaties and agreements expressly prohibit the practice. Streib, *supra,* at 7. According to Amnesty International, officially sanctioned executions of juveniles have occurred in only two other countries in the world in the last few years, Iran and The Republic of the Congo (DRC). Amnesty International, *Juveniles: The Death Penalty Gives up on Juvenile Offenders* (July 28, 2003), *at* http://www.amnestyusa.org/abolish/juveniles. Of the last seven juvenile offender executions, five occurred in the United States. Streib, *supra,* at 7.

■ *4. Independent Examination of Death Penalty. Atkins* also undertook an independent analysis of whether the death penalty was warranted for mentally retarded offenders by examining whether the social purposes intended to be served by the death penalty, retribution and deterrence, applied to mentally retarded offenders. *Atkins,* 536 U.S. at 318–19, 122 S.Ct. 2242. The Supreme Court found that neither purpose would be furthered by executing the mentally retarded, as such individuals are inherently less culpable than other actors and less able to deliberate about their actions and, thus, are less able to be deterred by awareness that their crime could result in death. *Id.* at 319–21, 122 S.Ct. 2242. Further, *Atkins* found that it was necessary to categorically exclude the mentally retarded from execution, rather than allowing their mental capacity to be considered on a case-by-case basis, because their reduced mental capaci-

---

**17.** These groups have set out their views on a web site that can be found at www.deathpenaltyreligious.org/education.

**18.** Juvenile Offender Public Opinion Survey, Center for Advanced Social Research, University of Missouri–Columbia (Mar.2003), *available at* http://www.abanet.org/crimjust/juvjus/mopoll.pdf.

ty would increase the possibility of false confessions and reduce their ability to show mitigation or assist counsel, so that "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution." *Id.* at 321, 122 S.Ct. 2242. Lastly, it concluded: "As *Penry* demonstrated ... reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." *Id.*

Similarly, as to juveniles, neither retribution nor deterrence provides an effective rationale for the imposition of the juvenile death penalty, and the risk of wrongful execution of juveniles is enhanced for reasons similar to that set out in *Atkins* in regard to the mentally retarded. While the parties have cited this Court to numerous current studies and scientific articles about the structure of the human mind, the continuing growth of those portions of the mind that control maturity and decision-making during adolescence and young adulthood, and the lesser ability of teenagers to reason, this Court need not look so far afield. The Supreme Court recognized the lesser culpability and developing nature of the adolescent mind in its 1988 decision in *Thompson,* 487 U.S. at 835, 108 S.Ct. 2687, in which it stated, "there is also broad agreement on the proposition that adolescents as a class are less mature and responsible than adults," *id.* at 834, 108 S.Ct. 2687, and therefore "less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult." *Id.* at 835, 108 S.Ct. 2687. *Thompson* noted that it was not the first time that the Court had been called upon to recognize the lesser culpability of the young, for in *Eddings v. Oklahoma,*

455 U.S. 104, 115–16, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982):

> We stressed this difference in explaining the importance of treating the defendant's youth as a mitigating factor in capital cases: "But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly 'during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment' expected of adults...."

*Thompson,* 487 U.S. at 834, 108 S.Ct. 2687. *Thompson* then stated:

> Thus, the Court has already endorsed the proposition that less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. The basis for this conclusion is too obvious to require extended explanation. Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult.

*Id.* at 835, 108 S.Ct. 2687 (footnotes omitted). *Thompson* concluded, "The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult." *Id.* Although Mr. Simmons is 17 rather than 15, he is still an adolescent, and this Court finds the rationales set forth in *Thompson* and *Eddings* apply here.[19]

---

**19.** *Stanford* did not find these rationales inapplicable to those 16 or 17 at the time of their crime, but instead found these issues irrelevant.

Similarly, the deterrence function of the death penalty can have little application to juveniles, not just because of their lesser ability to reason and their lack of informed judgment, but because, as discussed *supra*, the imposition of the death penalty on 16–year–olds and 17–year–olds has become so unusual in the last decade that "the likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Thompson*, 487 U.S. at 837, 108 S.Ct. 2687 (discussing effect of infrequency of executions of those 15 and younger).

Finally, as Mr. Simmons notes, the risk of wrongful execution also is greater as to younger offenders, who have had less time to develop ties to the community, less time to perform mitigating good works, and less time to develop a stable work history, than is true of adult offenders, and who are far more likely than adults to waive their rights and to give false confessions. Moreover, although nominally under Missouri law defendants are permitted to use their youth as a mitigating factor, this case provides a graphic illustration of the fact that their youth can become a further argument against them. In closing argument in Mr. Simmons' case, the state argued that the jury should not let him use his age to protect himself because if it did so, then he "wins." The state then argued, "Think about age. Seventeen years old. Isn't that scary. Doesn't that scare you? Mitigating? Quite the contrary I submit.

Quite the contrary." Thus, Mr. Simmons' youth was used to suggest greater immorality and future dangerousness and so to provide a further reason to impose the death penalty.

 For these reasons, this Court concludes that the Supreme Court of the United States would hold that the execution of persons for crimes committed when they were under 18 years of age violates the "evolving standards of decency that mark the progress of a maturing society," and is prohibited by the Eighth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment.[20]

## IV. CONCLUSION

For the reasons set out above, this Court sets aside Mr. Simmons' death sentence and re-sentences him, pursuant to the Court's authority under Sec. 565.035 RSMo 2000, to life imprisonment without eligibility for probation, parole, or release except by act of the Governor.

WHITE, C.J., WOLFF and TEITELMAN, JJ., concur.

WOLFF, J., also files separate concurring opinion.

PRICE, J., dissents in separate opinion filed.

BENTON and LIMBAUGH, JJ., concur in opinion of PRICE, J.

---

**20.** Because the Eighth and Fourteenth Amendments afford Mr. Simmons' relief, this Court need not reach Mr. Simmons alternative argument that, even if his execution is not barred by the Eighth Amendment, it is barred by article 1, section 21 of the Missouri Constitution.

# APPENDIX A

## Comparison:
## Executions of Juveniles and
## Mentally Retarded Persons
## by state since 1976*

In *Atkins v. Virginia (2002)* the US Supreme Court ruled that executions of the mentally retarded had become "cruel and unusual" among states. This chart shows that executions of the mentally retarded (documented retardation before the crime) have not only been more numerous than juvenile executions, but also more widespread among states (10 compared to 7). Also note that Texas accounts for more than half of all juvenile executions (13 of 21) and without that state's disproportionate contribution to the total, such executions are unusual indeed.
(ABA Juvenile Justice Center, February 2003)

■ Juveniles (21)

■ Mentally retarded (24)

* the death penalty was reinstated in 1976

US states which prohibit juvenile executions (28): Alaska, California, Colorado, Connecticut, Hawaii, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, New Jersey, New Mexico, New York, North Dakota, Ohio, Oregon, Rhode Island, Tennessee, Vermont, Washington, West Virginia, Wisconsin. Also, District of Columbia and US Federal Government.

MICHAEL A. WOLFF, Judge, concurring.

I concur in the principal opinion and in its holding that the Eighth Amendment's prohibition of cruel and unusual punishments bars the execution of those who were younger than 18 when their crimes were committed.

Both the principal opinion and the dissent strive earnestly to follow relevant precedent of the United States Supreme Court—whether that be the line of reasoning in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), or the result in *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). That Court's views may be as divided as this Court's. The underlying premise of both views is that the constitution forbids the execution of a person who, at the time of the crime, was not fully capable of the kind of adult moral judgment that would hold the offender subject to the death penalty for his crime.

The use of chronological age in making these judgments—as the Court did in *Stanford* and in *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988)—invites the drawing of a bright line as to the age at which a murder defendant may be subject to the death penalty.

The legislature has drawn the line for eligibility for the death penalty at age–15. Section 565.020.2.[1] The age 15 standard is consistent with *Thompson v. Oklahoma*, which held that a child who committed a crime when he was 15 or younger cannot receive the death penalty because of the Eighth Amendment's proscription of cruel and unusual punishments. Citing evolving standards, the principal opinion here holds that the line is now drawn at age 18.[2]

What is the nature of this judicial or legislative judgment? When any given age is used, it reflects a judgment that those below that age cannot be fully responsible in terms of being subject to the death penalty. The line is drawn because of the judgment that most if not all persons of such a youthful age are not morally capable of being fully responsible for their acts. This is true even though a child less than 18 may be tried as an adult, found guilty, and receive an adult non-capital sentence. *See* section 211.071.

The legislature traditionally has drawn lines by chronological age based on assumptions or experience as to maturity.[3] There is some judicial authority for defer-

---

**1.** All references are to RSMo 2000 unless otherwise indicated. Section 565.020.2 provides that the death penalty may not be applied where the defendant "has not reached his sixteenth birthday at the time of the commission of the crime."

**2.** In *Brennan v. State*, 754 So.2d 1 (Fla.1999), where the Florida Supreme Court held that 16–year–old defendants may not be subjected to the death penalty, Judge Anstead, specially concurring, wrote, "[s]omeone must draw these important lines, and in our unique framework of sharing governmental powers, this function of constitutional line-drawing has been assigned to the judicial branch." *Id.* at 12 n. 15 (citing *Thompson v. Ok.*, 487 U.S. 815, 840, 108 S.Ct. 2687, 101 L.Ed.2d 702

(1988)). Judge Anstead was aware of the arbitrariness that could result from such line drawing: "Inevitably, there will be cases where one day's difference in age will be the determinative factor between life and death." *Id.*

**3.** *See* section 311.325 (setting the minimum drinking age at 21); section 115.133 (setting the minimum voting age at 18); section 431.061 (consent to surgical or medical treatment); section 431.056 (minors' capacity to enter into contracts); section 451.090 (minors' capacity to enter into marriage contract); section 302.060 (age one can obtain a driving license); section 474.310 (must be 18 to make a will); and section 494.425 (must be 21 to serve on a jury).

ring to the legislature in this regard even as to capital punishment of those of a certain age, *see Thompson v. Oklahoma,* 487 U.S. at 854, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (O'Connor, J., concurring) ("I would not substitute our inevitably subjective judgment about the best age at which to draw a line in the capital punishment context for the judgments of the Nation's legislatures."). The *Thompson* decision itself, however, stands for the proposition that line drawing in capital cases is a prerogative of the judiciary in its role of safeguarding Eighth Amendment rights.

Judges have long drawn lines by chronological age. The common law—judge-made law—has had a rich, if somewhat checkered history of recognizing age categories when it comes to criminal responsibility. Under the common law, a child who reached the age of 14 was fully responsible for crimes as an adult. Under the age of seven the common law determined that a person had no criminal capacity. Between the ages of seven and 14, there was a rebuttable presumption that the child lacked capacity to be criminally responsible for the child's acts. The common law placed the burden on the prosecution to rebut the presumption of incapacity. ROLLIN M. PERKINS, CRIMINAL LAW 837 (2d ed.1969).

The common law, as Perkins has noted, has some grim examples: In the 13th century, a seven-year-old boy was tried for murder; his execution was "pardoned for the king's sake." *Id.* at 838. English records also show that a 13–year–old girl was executed for killing her mistress, a 10–year–old boy was executed for killing a companion, and an eight-year-old boy was similarly punished for "maliciously" burning some barns. *Id.* Perkins also notes that American records show the execution of two 12–year–old boys for murder. *Id.*

The standards of decency, cited by the United States Supreme Court and by the principal opinion in this case, seem certainly to have evolved. *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). But evolved how far?

Missouri's death penalty statute states that the jury, in determining whether or not to recommend the death penalty, can consider "age," but without elaborating how age is to be considered. Section 565.032.3(7). Despite the lack of elaboration in the statute, the jury is instructed to consider age as a mitigating factor. In this case, in the penalty phase final argument, the defense and the prosecution used Simmons' age in their arguments. In mitigation, the defense talked about 17–year–olds and their inability to think about the future, and about the fact that a person of 17 cannot vote or lawfully drink alcohol, but can be subject to the death penalty. The prosecutor used Simmons' age to argue that he should be put to death. The prosecutor's argument was: "Think about age. Seventeen years old. Isn't that scary? Doesn't that scare you? Mitigating? Quite the contrary I submit. Quite the contrary." The prosecutor seems to have implied that if Simmons was this bad at 17, he could only get worse.

The principal opinion draws a bright line based on the Eighth Amendment's prohibition of cruel and unusual punishments. However, if the Supreme Court of the United States does not agree with this Court's conclusion that the standard of decency has evolved to that point, the issue is certainly appropriate for a factual determination on a case-by-case basis. In that event, this Court may wish to take a cue from the statute's reference to age and borrow the "presumption" concept from the common law.

An updated version would be: A 16 or 17–year–old is presumed not to have the

capacity to be fully responsible and, therefore, eligible for the death penalty. In the penalty phase, the state could present evidence of the youthful defendant's full capacity, with the defense entitled to present evidence that the defendant was not fully responsible at the time of the crime so as to be eligible for the death penalty.[4] The state would have the burden of overcoming the presumption. The issue of responsibility, in the sense of eligibility for the death penalty, would become the subject of a jury finding, rather than a line drawn by the Court.

Using age as a bright line in juvenile death penalty cases involving 16 and 17 year-olds may be considered unreliable because age, standing alone, is not the true relevant factor as to why it is arguably unjust to impose the death penalty. "Rather, age is simply a 'proxy' for a combination of factors such as maturity, judgment, responsibility, and the capability to assess the possible consequences of one's conduct." Joseph L. Hoffmann, "On the Perils of Line Drawing: Juveniles and the Death Penalty," 40 HASTINGS L.J. 229, 258 (1989). Because age does not correspond perfectly to the combination of relevant factors, its use as a bright line produces "comparative injustice"—that is, some may be spared who are fully capable of receiving the death penalty and others executed who should have been found incapable.

The alternative is the adoption of presumptions with respect to the age of the murderer in capital cases.[5] In a case such as this one, where the defendant was a 17-year-old murderer, the Court could hold that persons below the age of 18 are presumed to lack sufficient maturity to be eligible for the death penalty. This presumption would be subject to rebuttal by the state, in which case the unusually mature 17-year-old murderer could receive the death penalty. Proof of such capacity should be beyond a reasonable doubt.[6]

4. Courts often make decisions regarding the capacity of juveniles. For example, in certifying a juvenile to be tried as an adult, the youth's age, maturity and sophistication are considered. State v. Thomas, 70 S.W.3d 496, 501 (Mo.App.2002); section 211.071.6. In Thomas, to evaluate whether the defendant, who was 16 at the time of the crime, should be tried as an adult, the chief juvenile officer prepared a report providing that the defendant " 'appears to be of low average intelligence, responsive, ... mature ... appears to know the difference between right and wrong ... appears to be sophisticated in his manner of living in that he makes his own decision.' " Id. To determine whether the defendant's capacity warrants the death penalty, evaluations similar to that performed for certification could be used.

5. The dissenters in Thompson v. Oklahoma also may well have been open to individualized consideration when deciding whether to subject juvenile offenders to the death penalty. Justice Scalia wrote at the beginning of his dissenting opinion that, "[i]f the issue before us today were whether an automatic death penalty for conviction of certain crimes could be extended to individuals younger than 16 when they commit the crimes, thereby preventing individualized consideration of their maturity and moral responsibility, I would accept the plurality's conclusion that such a practice is opposed by national consensus.... I might even agree with the plurality's conclusion if the question were whether a person under 16 when he commits a crime can be deprived of the benefit of a rebuttable presumption that he is not mature and responsible enough to be punished as an adult." 487 U.S. 815, 859, 108 S.Ct. 2687, 101 L.Ed.2d 702.

6. It can be argued that the statutory line that bars execution of offenders who were under age 16 at the time of their offenses contains a presumption that those age 16 and above are eligible for the death penalty. The statutory reference to age, and the jury instruction that age be considered a mitigating factor, would place the burden on the young offender to rebut the statute's supposed presumption. However, establishing presumptions and burdens is traditionally a judicial function,

Individualized treatment in juvenile death penalty cases would preserve the capital sentencing option while eliminating or diminishing the comparative injustice problem associated with line-drawing governed solely according to a defendant's age.

If the Supreme Court of the United States does not agree that age 18 is where the line now should be drawn, the presumption suggested here should be adopted. This would not be based on the Eighth Amendment's ban on cruel and unusual punishments, but rather a state-law interpretation of the statute that makes "age" a factor in capital sentencing.[7]

Requiring a specific jury finding on the youthful murderer's capacity would be consistent with this Court's over-all duty to ensure that a person lacking full capacity at the time of the crime not be subject to the death penalty.[8]

This alternative should be used only if the Eighth Amendment's prohibition of

cruel and unusual punishments is held not to bar execution of those who were younger than 18 when they committed their crimes. Because I believe the constitution does bar such executions, I concur in the principal opinion.

**WILLIAM RAY PRICE, JR.**, Judge, dissenting.

### I.

I respectfully dissent.

Our constitutional form of government allows for the will of the people to be expressed, for better or worse, through the laws enacted by their elected representatives. The role of the courts is merely to interpret such statutes and to rule upon their constitutionality, if necessary.

Missouri has enacted section 565.020.2, RSMo, providing that individuals over the age of sixteen, who knowingly cause the death of another after deliberation may be subjected to the death penalty. Although

---

though not exclusively so. In cases involving the death penalty, the judiciary's prerogative to establish presumptions and to assign the burdens of overcoming presumptions is a necessary part of the courts' duty to ensure that the death penalty is not wrongly imposed.

7. Come to that, the presumption logically could be applied to those under 21. That is, after all, the age at which the legislature deems a person to be mature enough to pass judgment as a juror. Section 494.425. *But see, Stanford v. Kentucky*, 492 U.S. at 374–377, 109 S.Ct. 2969. However, the presumption against the death penalty seems better suited for those ages 16 and 17 than for those over age 18. The justification for the presumption is that the death penalty is not appropriate for most persons of a certain age and, thus, the state should have the burden of showing that the less probable case—that the particular offender is mature enough to be subject to the death penalty—is true. If most but not all of those over age 18 are suitable for the death penalty, then a defendant may appropriately have the burden of showing

that, in his case, age is a sufficiently mitigating circumstance to avoid the death penalty.

8. Another statutory basis for holding persons under the age of 18 ineligible for the death penalty may be found in the duty of this Court to ensure proportionality under section 565.035.3(3) RSMo.2000. This section requires this Court to determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and *the defendant.*" (emphasis added) As the principal opinion's historical analysis demonstrates, in the last decade the death penalty has rarely been imposed on persons under the age of 18. If the sentence of death for a murderer who is less than 18 years old is compared to other sentences of murderers who were the same age, the likelihood of an under–18 murderer receiving the death penalty approaches the likelihood of being struck by lightning. The death penalty for under–18 offenders would appear to be disproportionate.

this statute is subject to serious controversy, it is the enacted will of the people of Missouri and must be enforced unless it is in violation of either the Missouri or the United States Constitutions.

The majority opinion of this Court holds that section 565.020.2 violates the United States Constitution. This opinion is directly in conflict with the United States Supreme Court decision of *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), consolidated with *Wilkens v. Missouri*, No. 87–6026, which specifically states:

> We discern neither a historical nor a modern societal consensus forbidding the imposition of capital punishment on any person who murders at 16 or 17 years of age. Accordingly, we conclude that such punishment does not offend the Eighth Amendment's prohibition against cruel and unusual punishment.

> The judgments of the Supreme Court of Kentucky and the Supreme Court of Missouri are therefore affirmed.

492 U.S. at 380, 109 S.Ct. 2969.

The United States Supreme Court has not overruled *Stanford*, even in light of its decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), nor after recent consideration of the precise arguments relied upon by the majority of this Court, *see Mullin v. Hain*, 538 U.S. ——, 123 S.Ct. 1654, 155 L.Ed.2d 508 (2003) (mem.) (order granting application to vacate the stay of execution of defendant who was seventeen years old when he committed murder); *In re Stanford*, 537 U.S. 968, 123 S.Ct. 472, 154 L.Ed.2d 364 (2002) (denying writ of *habeas corpus* of petitioner who was seventeen years when he committed murder); *Patterson v. Texas*, 536 U.S. 984, 123 S.Ct. 24, 153 L.Ed.2d 887 (2002) (denying writ of *habeas corpus* of petitioner who was seventeen years old when he committed mur-

der). It is the United States Supreme Court's prerogative, and its alone, to overrule one of its decisions. *United States v. Hatter*, 532 U.S. 557, 567, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001); *Hohn v. United States*, 524 U.S. 236, 252–53, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998); *State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

This Court is bound by the United States Supreme Court's decision in *Stanford v. Kentucky* and simply has no authority to overrule that decision.

## II.

Petitioner, Christopher Simmons, was born on April 26, 1976. On September 10, 1993, when he was approximately seventeen-years and five-months old, petitioner was arrested for the murder of Shirley Crook. Following a botched robbery attempt, petitioner kidnapped Ms. Crook, bound and gagged her. Petitioner walked Ms. Crook down a railroad trestle, bound her more, and pushed her, while still alive, over the trestle and into the Meramec River. Prior to the robbery, petitioner stated to his accomplice that they could commit a robbery and murder and get away with it because they were juveniles.

Petitioner now asks this court for *habeas corpus* relief, alleging that his death sentence is illegal because he was a juvenile at the time of his crime. Petitioner acknowledges that *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), explicitly held that the United States Constitution was not violated by the execution of a sixteen or seventeen-year-old defendant. However, petitioner alleges that the United States Supreme Court's recent decision, *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335

(2002), *"implicitly* overrules the controlling precedent of *Stanford....*" (emphasis added).

*Stanford* specifically addressed Missouri's capital punishment statute in determining that there was "neither a historical nor a modern societal consensus forbidding the imposition of capital punishment on any person who murders at 16 or 17 years of age" and "such punishment does not offend the Eighth Amendment's prohibition against cruel and unusual punishment." *Stanford,* 492 U.S. at 366, 380, 109 S.Ct. 2969. *Stanford* noted its petitioners failed to establish a societal "consensus against capital punishment for 16– and 17–year–old offenders through state and federal statutes and the behavior of prosecutors and juries...." *Id.* at 377, 109 S.Ct. 2969. The Supreme Court explicitly refused to consider "other indicia, including public opinion polls, the views of interest groups, and the positions adopted by various professional associations." *Id.* "A revised national consensus so broad, so clear, and so enduring as to justify a permanent prohibition upon all units of democratic government must appear in the operative acts (laws and the application of laws) that the people have approved." *Id.*

The United States Supreme Court did not overrule *Stanford* in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). *Atkins* did not deal with juveniles, but addressed capital punishment of mentally retarded persons. *Id.* at 2244. The Court held that capital punishment of the mentally retarded was cruel and unusual for two reasons: 1) mentally retarded persons "do not act with the level of moral culpability that characterizes the most serious adult criminal conduct," *Id.;*

and 2) the prevailing standards of decency reflected by objective standards such as legislatures, experts, and the public establish a consensus against imposing capital punishment upon the mentally retarded. *Id.*

United States Supreme Court decisions interpreting the Constitution are the supreme law of the land. *Cooper v. Aaron,* 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).[1] "State court judges in Missouri are bound by the 'supreme law of the land,' as declared by the Supreme Court of the United States (Art. VI, Constitution of the United States)." *Kraus v. Bd. of Educ.,* 492 S.W.2d 783, 784 (Mo.1973). *See also Rodgers v. Danforth,* 486 S.W.2d.258, 259 (Mo. banc 1972) (citing U.S. Const. art. VI; *Cooper,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (This court "is bound to follow the decisions of the Supreme Court of the United States.")).

This Court's solemn duty to abide by decisions of the Supreme Court of the United States is not abridged simply because we disagree with that Court's decision or even if it appears that a decision was clearly in error. Neither can this Court imply or anticipate the overruling of a decision of the United States Supreme Court.

In *State Oil Co. v. Khan,* the court of appeals "characterized [the United States Supreme Court's previous decision] as 'unsound when decided' and 'inconsistent with later decisions' of [that] Court," but "felt constrained to follow that decision." 522 U.S. 3, 9, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (citation omitted). The Supreme Court of the United States agreed with the appellate court's characterization of its previous opinion, but applauded the court

---

**1.** "[T]he interpretation of [the Constitution] enunciated by this Court in [its decision] is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Cooper,* 358 U.S. at 18, 78 S.Ct. 1401.

of appeals for respecting the doctrine of *stare decisis*. *Id.* at 20, 118 S.Ct. 275

Despite what Chief Judge Posner aptly described as *Albrecht's* "infirmities, [and] its increasingly wobbly, motheaten foundations," there remains the question whether *Albrecht* [*v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968)] deserves continuing respect under the doctrine of *stare decisis*. The Court of Appeals was correct in applying that principle despite disagreement with *Albrecht*, for it is this Court's prerogative alone to overrule one of its precedents.

*Id.* (internal citation omitted).

Similarly, *Rodriguez de Quijas v. Shearson/American Express, Inc.* noted a shift away from "the old judicial hostility to arbitration." 490 U.S. 477, 480, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). That view had "been steadily eroded over the years" and the Court itself took notice of the shift in a prior opinion. *Id.* at 480–81, 109 S.Ct. 1917. However, the Supreme Court "did not suggest that the Court of Appeals on its own authority should have taken the step of renouncing" the Court's prior decision. *Id.* at 484, 109 S.Ct. 1917.

If a precedent of [the Supreme Court of the United States] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals [or other court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.

*Id.*

The Supreme Court of the United States has not chosen to exercise its prerogative of overruling *Stanford v. Kentucky*, despite several very recent opportunities to do so. *See Mullin v. Hain*, 538 U.S. ——, 123 S.Ct. 1654, 155 L.Ed.2d 508 (2003) (mem. order); *In re Stanford*, 537 U.S. 968, 123 S.Ct. 472, 154 L.Ed.2d 364 (2002);

*Patterson v. Texas*, 536 U.S. 984, 123 S.Ct. 24, 153 L.Ed.2d 887 (2002). In each case, the defendant was seventeen-years-old when he committed the crime for which he was sentenced to death. The Supreme Court refused to reexamine *Stanford v. Kentucky* despite vigorous dissents raising precisely the same arguments as presented to this Court.

While the majority of this Court might believe that *Stanford v. Kentucky* has been abandoned in light of *Atkins* and in light of their perception of a national consensus regarding capital punishment of juvenile offenders, their belief and perception are not sufficient to preempt the Supreme Court of the United States concerning its existing precedent.

It is the prerogative of the Supreme Court of the United States, and its alone, to overrule one of its decisions.

The proper venue for Simmons to seek relief on this issue is the Supreme Court of the United States. I would deny the writ.